Marlene EBERLE, et al., Plaintiffs,

and

Robert Kiser, Plaintiff–Appellant,

v.

CITY OF ANAHEIM; Anaheim Police Department; P. Shepard; Hagenson; Monsoor, et al., Defendants–Appellees.

No. 88–6125.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 8, 1990.

Decided April 26, 1990.

James P. Downs, Murray & Associates, San Francisco, Cal., for plaintiff-appellant.

James P. Collins, Jr., and Jeffrey L. Garland, Cotkin, Collins & Franscell, Santa Ana, Cal., for defendants-appellees.

Before THOMPSON and TROTT, Circuit Judges, and THEIS, Senior District Judge.[*]

DAVID R. THOMPSON, Circuit Judge:

Appellant Robert Kiser ("Kiser") appeals from a judgment entered on a jury verdict in favor of certain officers of the Anaheim City Police Department ("appellees") in this action brought under 42 U.S.C. § 1983. Kiser claims the officers violated his civil rights under the Constitution by arresting him without probable cause and by using excessive force in effecting his arrest. We have jurisdiction pursuant to 28 U.S.C. § 1291 and we affirm.

## FACTS AND PROCEEDINGS

Kiser, a San Francisco Forty–Niner football fan, attended a football game between the Forty–Niners and the Los Angeles Rams at Anaheim Stadium in Anaheim, California. He was accompanied by his wife, Claudia, and their friends, Peter and Marlene Eberle. At the game, Kiser and his group took their seats amid a group of predominantly Ram fans.

During the game, Officers David Monsoor and Ty Hagenson responded to a radio call of a disturbance in the area of the stadium where Kiser was seated. An usher told the officers there were two men in the stands being belligerent, using foul language, and making rude hand gestures toward the crowd. The usher also told the officers he thought they should take some action, otherwise a fight might ensue.

The officers observed Kiser and Mr. Eberle for approximately a minute. The officers saw the men stand up, turn their backs to the field, and make rude hand gestures to the crowd. Officer Hagenson saw one of the men shake a pom-pom in the faces of the people behind him. Officer Monsoor testified he believed Kiser was challenging someone seated a few rows behind him to a fight. The officer based this conclusion on the focus of Kiser's eyes, the way he clenched his hands, and the intensity of his actions. Officer Monsoor further testified that such a personal threat would be a violation of California Penal Code § 415 (disturbing the peace).

The officers decided to question Kiser and Mr. Eberle. As they proceeded to the row in the stands where the men were seated, four or five people in the stands told them that Kiser and Mr. Eberle were causing problems. After getting the men's attention, the officers attempted to persuade them to leave their seats and talk with the officers up in the concourse. Officer Monsoor testified that the officers wanted to interview the men in a place that was calm and safe. The other fans were yelling at the officers and the stairs upon which they were standing were very steep, providing little room for the officers to maneuver in the event of trouble.

Initially, the two men refused to leave their seats. They told the officers that if the officers wanted to speak with them, the officers should come over to where they were sitting. Eventually, however, the men agreed to accompany the officers.

[*] Honorable Frank G. Theis, Senior United States District Judge for the District of Kansas, sitting by designation.

The officers used no physical contact or coercion as the men left their seats and were escorted up the stairs to the concourse. Officer Hagenson told the men that they would not be arrested nor would they be ejected from the stadium.

As the officers and the two men went up the stadium stairs, they were joined by Officer Shepard and Sergeant Haradon. Verbal exchanges between the two men and the crowd continued, and one of the men made a rude hand gesture toward the crowd.

Upon entering the concourse, Officer Monsoor paired off with Kiser and Officer Hagenson paired off with Mr. Eberle. Officers McMillian and Patterson then arrived on the scene. Officer McMillian positioned himself next to Kiser. The various officers proceeded to talk with Kiser and Mr. Eberle about the events that had occurred in the stadium stands.

A crowd of onlookers soon formed and started yelling and cheering. Sergeant Haradon directed his attention to the crowd to ensure that no one approached the other officers or tried to interfere with the interviews. At about this time, Mrs. Kiser approached Sergeant Haradon and attempted to walk over to her husband. Sergeant Haradon informed Mrs. Kiser that she was interfering with the interviews and should return to the crowd. Mrs. Kiser then took both her fists and pushed against Sergeant Haradon's chest. Sergeant Haradon took Mrs. Kiser by the arm and escorted her back to the crowd, where she remained.

Mrs. Eberle also went to the concourse. She protested the innocence of her group and claimed the Rams fans were at fault. Officer Shepard attempted to question Mrs. Eberle, however, she repeatedly moved away from him, stating she wanted to be with her husband. Officer Shepard requested that she stay with him. When Mrs. Eberle attempted to walk away, Officer Shepard touched her on the arm and again asked her to wait with him. In reaction, Mrs. Eberle threw beer on the officer. Officer Shepard immediately placed Mrs. Eberle under arrest for the crimes of assault and battery. He attempted to hand-cuff her but she resisted arrest. She kicked at the officer and locked her hands up against her chest. With the help of Officer Patterson, Officer Shepard eventually handcuffed her.

While Officer Shepard was attempting to arrest Mrs. Eberle, Mr. Eberle pushed Officer Hagenson back, went over to Officer Shepard, and grabbed his shoulder. Officer Hagenson then grabbed Mr. Eberle's arm and removed it from Officer Shepard. Although he resisted, Officer Hagenson placed Mr. Eberle's arm behind his back and ordered him to relax, which he did. Officer Shepard then placed Mr. Eberle under arrest for interfering with the duties of a police officer.

As the situation between the officers and Mr. and Mrs. Eberle escalated, Officer McMillian placed Kiser in an index-finger control hold. Officer McMillian testified that the situation had become extremely agitated and volatile. He also testified that he knew Kiser was part of the group causing the disturbance. He testified that he applied the finger-hold to keep the situation from escalating further by preventing Kiser's participation. He further testified that the finger-hold allowed him to direct Kiser's movement, but that he did not apply the hold with enough force to inflict pain.

Sergeant Haradon testified that because Kiser was with the persons causing the disturbance and because there was a crowd of sixty-to-seventy people watching and cheering, it was appropriate for Officer McMillian to apply the finger-hold to control Kiser.

Immediately following the arrests, the officers took Mr. and Mrs. Eberle to the security office. Mrs. Eberle continued to resist. Officers Monsoor and McMillian also escorted Kiser to the security office, with McMillian maintaining the finger-hold on Kiser to control him.

Kiser said nothing during the trip to the security office to indicate that he was in any pain. The officers placed Kiser in an unlocked office with several other officers. Sergeant Beardman, not a defendant in this case, then made the decision to eject Kiser

from the stadium. Officer Monsoor testified the decision to eject Kiser was made because the officers feared that there might have been a fight or other disturbance if Kiser had gone back into the stadium. Officer Monsoor escorted Kiser out of the stadium without resorting to any physical contact.

The Eberles and the Kisers subsequently filed suit against six Anaheim police officers and the City of Anaheim ("City").[1] They sought damages pursuant to 42 U.S.C. § 1983 and various state tort causes of action. In support of their section 1983 action, the plaintiffs alleged that the defendants had violated their first amendment rights to freedom of expression, travel, and assembly, and their fourth amendment rights to freedom from unreasonable seizure and from the use of excessive force in effecting their arrests.

The original pretrial order, which plaintiffs' counsel signed, was filed July 15, 1985. This order included no issue implicating the first amendment. On March 7, 1988, the plaintiffs moved to amend the pretrial order. By this amendment they sought to add a claim based on the alleged violation of their first amendment rights. The district court rejected the proposed amendment. The district court ruled that the first amendment issue had been waived by the plaintiffs' failure to include such an issue in the original pretrial order.

Trial commenced March 22, 1988. On the first day of trial, the district court dismissed all the plaintiffs' pendent state causes of action. The court held that the plaintiffs had failed to comply with the applicable California governmental claims statutes. The trial lasted seven days. At its conclusion, the jury heard no arguments on and received no instructions pertaining to the plaintiffs' first amendment claims. The jury returned a verdict in favor of all the defendants. The district court entered judgment on this verdict on April 15, 1988.

On April 21, 1988, Kiser moved for judgment notwithstanding the verdict. The district court summarily denied this motion on

the ground that Kiser had failed to move for a directed verdict at the close of all the evidence. The district court also denied the plaintiffs' motions for a new trial. This appeal by Kiser followed.

## DISCUSSION

### A. First Amendment Claim

■ Kiser contends he was arrested and ejected from the stadium because he had been cheering for his team and otherwise exercising his first amendment right of free speech. Therefore, he argues, his seizure violated the federal Constitution. Kiser asserts there was substantial evidence before the jury on this theory of his case and there was insufficient evidence to the contrary to support the verdict in favor of the officers.

The threshold problem with this argument is that Kiser did not include his first amendment claim, or any issue pertaining to it, in the initial pretrial order. Almost three years after the pretrial order was entered, and just fifteen days before trial, Kiser sought to add the theretofore omitted first amendment issue. The district court denied Kiser's motion to amend. Thus, the issue Kiser would have us consider is not set forth in the pretrial order. Accordingly, Kiser was precluded from offering evidence on this issue, or otherwise advancing this theory of recovery, during the trial. *Northwest Acceptance Corp. v. Lynnwood Equip., Inc.*, 841 F.2d 918, 924 (9th Cir.1988); *United States v. First Nat'l Bank*, 652 F.2d 882, 886 (9th Cir.1981). Because the issue was not before the trial court, we will not rule on it on appeal. *Ferris v. Santa Clara County*, 891 F.2d 715, 719 (9th Cir.1989).

■ In his reply brief, Kiser focuses his attack on the pretrial order itself. He contends the district court abused its discretion by refusing to permit him to amend the pretrial order to include the first amendment issue. Without expressing any opinion on the merits of this argument, we note it is probably the argument Kiser should make; but it comes too late. Kiser

1. The claims against the City were dismissed on summary judgment. Kiser does not appeal this ruling by the district court.

did not raise the argument in his opening brief. Indeed, in his opening brief he neither mentions the pretrial order nor the district court's denial of his motion to amend it. The first time the argument pops up is in Kiser's reply brief.

"It is well established in this circuit that ' "[t]he general rule is that appellants cannot raise a new issue for the first time in their reply briefs." ' " *Northwest Acceptance Corp.*, 841 F.2d at 924 (quoting *United States v. Birtle*, 792 F.2d 846, 848 (9th Cir.1986)). We could consider the issue had appellees raised it in their brief. *Ellingson v. Burlington N., Inc.*, 653 F.2d 1327, 1332 (9th Cir.1981). But appellees merely noted that Kiser had failed to raise the issue. Such an observation does not constitute raising the issue. *Id.* We could also "consider the issue [if] the appellee has not been misled and the issue has been fully explored." *Id.* (citation omitted). This, however, is not the case. The issue has not been fully explored. Accordingly, we hold that the issue has been waived. *See id.*

## B. *Fourth Amendment Claims*

### 1. *Standard of Review*

Generally, "[t]he standard of review for a jury verdict in a civil case is whether it is supported by substantial evidence, that is, such relevant evidence as reasonable minds might accept as adequate to support a conclusion." *Roberts v. College of the Desert*, 870 F.2d 1411, 1417 (9th Cir.1988). In its order denying Kiser's motion for JNOV, however, the district court noted that Kiser had failed to move for a directed verdict after the close of all the evidence. " 'It is thoroughly established that the sufficiency of the evidence is not reviewable on appeal unless a motion for a directed verdict was made in trial court.' " *Benigni v. City of Hemet*, 879 F.2d 473, 476 (9th Cir.1988) (quoting *United States v. 33.5 Acres of Land*, 789 F.2d 1396, 1400 (9th Cir.1986)).

There are only two exceptions to [this rule]. First, where the district court has taken a motion for a directed verdict made at the close of the plaintiff's evidence under advisement and reserves ruling on it until the close of all the evidence, the first motion is considered to still be in effect. Second, where an ambiguous or inartful request for a directed verdict is made that adequately puts the issue of the sufficiency of the evidence before the trial court, the court may still consider a motion for a JNOV.

*Cabrales v. County of Los Angeles*, 864 F.2d 1454, 1459 (9th Cir.1988).

Neither of these exceptions applies to the present case. Thus, "[b]ecause [Kiser] is precluded from challenging the sufficiency of the evidence, our 'inquiry is limited to whether there was any evidence to support the jury's verdict, irrespective of its sufficiency, or whether plain error was committed which, if not noticed, would result in a "manifest miscarriage of justice." ' " *Benigni*, 879 F.2d at 476 (quoting *Herrington v. County of Sonoma*, 834 F.2d 1488, 1500 (9th Cir.1987), *amended*, 857 F.2d 567 (9th Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 1557, 103 L.Ed.2d 860 (1989)); *accord Cabrales*, 864 F.2d at 1459.

### 2. *Scope and Quality of Detention*

#### a. *Seizure*

■ Kiser contends there is no evidence to support the jury's verdict that his detention was a reasonable "seizure" under the fourth amendment. Appellees acknowledge that a seizure occurred. The question is whether there is evidence to support the jury's verdict that the seizure was reasonable.

Under the fourth amendment, Kiser's detention "must be justified by some objective manifestation that [he was], or [was] about to be, engaged in criminal activity." *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 694, 66 L.Ed.2d 621 (1981). "Based upon [the] whole picture the detaining officers must have [had] a particularized and objective basis for suspecting [Kiser] of criminal activity." *Id.* at 417–18, 101 S.Ct. at 694–95, *accord United States v. Sokolow*, —— U.S. ——, 109 S.Ct. 1581, 1585–87, 104 L.Ed.2d 1 (1989).

In this case, two officers testified that third parties informed them Kiser was causing a disturbance in the stands which could lead to a fight. They also observed Kiser acting in a manner which, in their opinion, constituted the crime of disturbing the peace. Thus, there is evidence that the

officers had more than an "incohate and unparticularized suspicion or 'hunch,'" *Terry v. Ohio*, 392 U.S. 1, 27, 88 S.Ct. 1868, 1883, 20 L.Ed.2d 889 (1968), that Kiser was engaged, or about to become engaged, in criminal activity. We conclude that the appellees had reasonable justification for detaining Kiser.

### b. *Arrest*

Kiser next contends there was no evidence to support the jury's determination that there was probable cause for his arrest. Appellees concede they had no probable cause to arrest Kiser. They argue they did not arrest him, and that his seizure was no more than an investigatory detention.

"There is no 'litmus-paper test ... for determining when a seizure exceeds the bounds of an investigative stop.' In determining whether an investigative detention has ripened into an arrest, we consider the totality of the circumstances." *United States v. Baron*, 860 F.2d 911, 914 (9th Cir.1988), *cert. denied*, — U.S. —, 109 S.Ct. 1944, 104 L.Ed.2d 414 (1989) (quoting *Florida v. Royer*, 460 U.S. 491, 506, 103 S.Ct. 1319, 1329, 75 L.Ed.2d 229 (1983) (plurality opinion)) (citation omitted). "The proper focus when determining coerciveness or restraint sufficient to constitute an arrest or detention is not on the subjective belief of the agents. Rather we review the situation from the prospective of the person seized." *United States v. Delgadillo–Velasquez*, 856 F.2d 1292, 1295 (9th Cir. 1988). The question is thus whether "a reasonable innocent person in these circumstances would not have felt free to leave after brief questioning." *Id.* at 1295–96.

At least some evidence supports the jury's verdict that a reasonable innocent person in Kiser's circumstances would feel free to leave after brief questioning by the officers. Although the officers forcibly took Kiser to the security office, they did not subject him to the same treatment as his friends, the Eberles, who were arrested. The jury could have determined that a reasonable innocent person in Kiser's circumstance would conclude that he would be free to leave after questioning, whereas the Eberles would not.

Furthermore, if "there are ... reasons of safety and security that would justify moving a suspect from one location to another during an investigatory detention, such as from an airport concourse to a more private area," *Royer*, 460 U.S. at 504–05, 103 S.Ct. at 1328, then this would mitigate against such a relocation constituting an arrest. The officers testified that they felt unsafe because of the large crowd that had gathered in the concourse. The jury could have found that a reasonable innocent person in these circumstances would believe he was being moved for safety reasons and would feel free to depart after the questioning had finished at a safer location.

Nor did Officer McMillian's use of force, in the form of the finger-hold, turn the detention into an arrest. "The use of force during a stop does not convert the stop into an arrest if it occurs under circumstances justifying fears for personal safety." *United States v. Buffington*, 815 F.2d 1292, 1300 (9th Cir.1987); *accord United States v. Jacobs*, 715 F.2d 1343, 1345–46 (9th Cir.1983). Officer McMillian testified he applied the hold to prevent Kiser from entering the fray between the other officers and the Eberles. He testified he felt he was justified in applying the hold, because Kiser was a friend of the Eberles and might be inclined to come to their aid. Although there appears to be no evidence that Kiser made any attempt to help his friends, the officer's testimony provides some evidence upon which the jury could decide that the hold was applied under circumstances justifying the officer's fear for the personal safety of the other officers, as well as for the safety of bystanders who might suffer injury if the altercation were to escalate.

### 3. *Excessive Force*

Finally, Kiser argues there was no evidence to support the jury's verdict that the finger-hold was an objectively reasonable use of force under the circumstances. Appellees agree that "objective reasonableness" is the proper standard, but argue that the jury had before it evidence to support the verdict that the officer's use of force was not excessive.

The district court instructed the jury that: "In determining whether excessive force was used, you should consider ... whether the force was applied in a good faith effort to maintain and restore discipline, or maliciously and sadistically for the very purpose of causing harm." Reporter's Transcript at 134 (Apr. 12, 1988). For the reasons hereafter stated, we hold it was plain error to give this instruction.

Until recently, the law in this circuit was that excessive force claims arising out of arrests and investigatory stops should be analyzed under substantive due process. A plaintiff "could establish a substantive due process violation only if the force ... was applied 'maliciously and sadistically for the very purpose of causing harm.'" *Reed v. Hoy,* 891 F.2d 1421, 1423 (9th Cir.1989) (quoting *Rinker v. County of Napa,* 831 F.2d 829, 832) (9th Cir.1987). The Supreme Court in *Graham v. Connor,* — U.S. —, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) specifically rejected this approach. The Court held that *"all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." *Id.* 109 S.Ct. at 1871.

*"Graham* clearly overrules past Ninth Circuit precedent." *Reed,* 891 F.2d at 1425. We have also held that the factors announced in *Chevron Oil Co. v. Huson,* 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971), "favor retroactive application of *Graham." Reed,* 891 F.2d at 1426. Thus, we must reverse this case for plain error unless we conclude that Officer McMillian's "actions were reasonable as a matter of law and that we should affirm on the basis that he was entitled to a directed verdict." *Id.* at 1427. In resolving this question, we must balance " 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham,* 109 S.Ct. at 1871 (quoting *Tennessee v. Garner,* 471 U.S. 1, 8, 105 S.Ct. 1694, 1699, 85 L.Ed.2d 1 (1985)). Such a balancing "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* 109 S.Ct. at 1871–72.

The events giving rise to this case began in the stadium stands during a football game between historical rivals. Emotions run high during these events. Passion can supplant reason. Behavior can become reactive rather than reflective. Aggressive conduct is not uncommon. The potential for violence is omnipresent. Indeed, at the time Officer McMillian applied the finger-hold to Kiser, Kiser's friends were scuffling with other officers in the concourse and actively resisting arrest. A crowd of sixty-to-seventy spectators had gathered to yell and cheer at the spectacle. It is hard to imagine a more explosive and potentially dangerous situation than that which confronted the officers. They had to act before the situation got out of hand. Officer McMillian chose to restrain Kiser's movements, to control him with a finger-hold and move him to a safe area. We conclude as a matter of law that Officer McMillian acted in this regard in a reasonable and appropriate manner. Given the circumstances of this case, Officer McMillian and his fellow officers controlled and diffused a volatile situation which easily could have erupted into a perilous melee. They are to be commended for their actions.

AFFIRMED.