**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
    *Plaintiff-Appellee,*

  v.

ELVIRA CHARLEY,
    *Defendant-Appellant.*

No. 03-10579

D.C. No.
CR-02-00081-1-
EHC

OPINION

Appeal from the United States District Court
for the District of Arizona
Earl H. Carroll, District Judge, Presiding

Argued and Submitted
December 7, 2004—San Francisco, California

Filed February 3, 2005

Before: Dorothy W. Nelson, Andrew J. Kleinfeld, and
Ronald M. Gould, Circuit Judges.

Opinion by Judge Gould

## COUNSEL

Patrick E. McGillicuddy, Phoenix, Arizona, for the defendant-appellant.

Paul K. Charlton, United States Attorney, District of Arizona, Michael T. Morrissey, Chief, Appellate Section, and Joan G. Ruffennach, Assistant United States Attorney, Phoenix, Arizona, for the plaintiff-appellee.

## OPINION

GOULD, Circuit Judge:

A federal jury convicted Elvira Charley of three counts of first degree murder in violation of 18 U.S.C. §§ 1111, 1153(a), and three counts of using a firearm during and in relation to a crime of violence in violation of 18 U.S.C. §§ 924(c), (j). Charley appeals her conviction alleging that the district court erred in denying motions to suppress her statements to law enforcement officers because the statements were obtained in violation of her rights under the Fourth and Fifth Amendments.[1] We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm.

---

[1] We decide Charley's Fourth and Fifth Amendment claims in this opinion, and address her claims relating to her competency and the district court's jury instructions in a concurrently filed memorandum disposition.

**I**

On the tragic morning of January 1, 2002, Elvira Charley shot three of her six children to death with a .22 caliber semi-automatic rifle, as they slept in the Charley family home located on the Navajo Indian Reservation in Klagetoh, Arizona. When the children were dead, Charley covered their bodies with blankets and went to the home of her aunt, Minnie Begay. After visiting with the Begays for more than an hour, Charley left, telling those present that she was going home to "check on her kids."

Charley later returned to the Begay residence with one of her remaining children, and then left again to make phone calls. She first called her estranged husband and told him that she had shot their three older children. After hanging up with her husband, Charley called the police dispatcher and asked for police assistance because, as she said, she had "done something bad." She gave the dispatcher directions to the Begay residence and asked the dispatcher to send someone quickly.

Charley then went back to the Begay residence and gave her children's birth certificates to one of her cousins saying, "take care of my kids, here [is] all the information you need." Charley did not explain why she needed someone to care for her children. When the police arrived, Charley began hugging her relatives, saying, "I'm sorry . . . I wasn't strong enough."

Sergeant Wallace Billie and Peter Lincoln, an Emergency Medical Technician ("EMT") from the local fire department, were among the government officers dispatched to the Begay residence. Upon his arrival at the Begay home, Sergeant Billie observed Charley crying and hugging another female. Charley then handed Sergeant Billie the keys to her house, stating "that she'd done something very bad, and that she needed [Sergeant Billie] to check on her children." Charley also told

Sergeant Billie that he was "going to have to put [her] away for a long time."

Several of Charley's relatives who were present at the Begay residence began asking Sergeant Billie what was going on. Sergeant Billie asked EMT Lincoln to escort Charley from the house so that Sergeant Billie could talk to Charley's relatives and explain what was happening.

While waiting for Sergeant Billie outside the Begay residence, Charley initiated a conversation with EMT Lincoln, whom she had known in a personal capacity for about twenty years. Charley addressed EMT Lincoln as "Peter" and volunteered that she had done "something very bad." Charley further told EMT Lincoln that she had killed her children and that the bodies were still at her house.

When Sergeant Billie came out to his patrol car, he told Charley, "You're not under arrest. You're being detained. I need to take you to your house and find out what's going on." She replied, "You're going to have to take me away for a long time." Sergeant Billie placed Charley in the patrol car and she gave him directions to her house. When Sergeant Billie asked for permission to enter Charley's house, Charley responded, "Yes," urging him to hurry because the children were inside.

After finding the lifeless bodies of three of Charley's children inside the house, Sergeant Billie secured the scene, and proceeded to question Charley as she sat in his patrol car. The district court found that Charley received *Miranda* warnings before the interrogation began and that Charley "knowingly and voluntarily waived her rights and made statements" to Sergeant Billie. According to Sergeant Billie, Charley was coherent and did not appear to be under the influence of drugs or alcohol at this time. Moreover, there was no language barrier, and Charley was not handcuffed, threatened, or abused in any way. During the interview by Sergeant Billie in his car, Charley admitted to killing her children as they slept, and

described the manner and order in which she had shot them. When the questioning ended, Sergeant Billie arrested Charley and escorted her to the tribal jail.

Charley made several unsolicited statements regarding her children to the booking personnel at the tribal jail as they were taking down her medical information. For example, she said, "Poor things. They had no choice. I could not take care of them." When asked if she had ever considered killing herself, Charley responded, "no," but further remarked, "[b]ut now I killed my own kids."

Charley was interviewed on the evening of January 1, 2002, by Special Agent Bradley Purscell of the FBI. Agent Purscell prefaced the interview by reading Charley the standard FBI advice of rights form. Charley reviewed and signed the form, telling Agent Purscell that she understood her rights and wished to waive them. The interview was conducted in English, with no language problems. Agent Purscell reported that Charley seemed coherent and did not appear to be under the influence of drugs or alcohol. Agent Purscell did not abuse or threaten Charley to make her talk.

During the session with Agent Purscell, Charley again admitted to shooting her three oldest children while they slept. She described the manner and order in which she had shot them, and told Purscell how she had covered the children's bodies with their blankets because she could not stand the sight of their blood. She also said, "you know what, I brought them into this world, and I took them from it, but they will always be with me."

Charley was arraigned in tribal court on January 2, 2002, for endangering the welfare of minors and for criminal homicide. Charley then told the tribal court that she wanted to consult with a lawyer before pleading to the tribal court charges against her.[2] The tribal court entered a default plea of not

---

[2]Charley's colloquy with the tribal court was as follows:

COURT: You said "I can't decide [how to plead to the tribal

guilty and scheduled a pretrial conference for Charley to attend at a later date after she had secured an attorney.

On January 3, 2002, Agent Purscell escorted Charley to her initial appearance in federal district court. During this trip, Agent Purscell again interviewed Charley. Before commencing this second interview, Agent Purscell again read Charley the *Miranda* warnings, and Charley again waived her rights by executing a written waiver. The responsive information that Charley gave in this second interview was substantially the same as the information she had given Agent Purscell on January 1, 2002.

Charley was subsequently indicted on three counts of first degree murder in violation of 18 U.S.C. §§ 1111, 1153(a), and three counts of use of a firearm during and in relation to a crime of violence in violation of 18 U.S.C. §§ 924(c), (j). After her indictment, Charley filed motions to suppress the statements that she had made to law enforcement personnel on January 1, 2002, and on January 3, 2002. The district court conducted hearings on the motions to suppress, took the motions under advisement, and then denied them both.

In a seven-day trial, the government presented evidence including Charley's statements to Sergeant Billie and Agent Purscell which had not been suppressed.[3] The jury found Charley guilty on all counts, three of first degree murder and three for firearm use in the murders. The district court then

---

court charges] until I talk to my lawyer," that's what you're saying right?

ELVIRA: Yes.

[3]The jury also heard evidence of Charley's January 1, 2002, statements to the police dispatcher, to her relatives at the Begay house, to EMT Lincoln, and to the booking personnel at the tribal jail, all of which were made on the date of the murders and none of which were subject to her failed motions to suppress.

provisionally sentenced Charley to six consecutive life terms under 18 U.S.C. § 4244, and we consider in this opinion whether the district court committed reversible error in denying Charley's motions to suppress.

## II

We review Charley's motions to suppress de novo. *United States v. Crawford*, 372 F.3d 1048, 1053 (9th Cir. 2004) (en banc). The determination of whether a seizure exceeds the bounds of an investigatory *Terry* stop and becomes an arrest is also reviewed de novo. *United States v. Miles*, 247 F.3d 1009, 1012 (9th Cir. 2001). Charley's briefing on these issues is unclear. But her principal argument appears to be that the district court erred in declining to suppress the statements she made to Sergeant Billie on January 1, 2002, because, she argues that those statements were the fruits of an illegal arrest made without probable cause in violation of the Fourth Amendment. Charley also contends that she was entitled to suppression of the incriminating statements she made to FBI Agent Purscell on January 3, 2002, because, she argues, those statements were obtained in violation of her Fifth Amendment right to counsel.

## A

Charley maintains that the district court should have suppressed all the statements she made to Sergeant Billie on January 1, 2002, because those statements were the fruits of her allegedly illegal arrest and because the taint of this alleged illegal arrest was not purged by the *Miranda* warnings she received. Charley argues that the district court erred in finding that she was not in custody when Sergeant Billie took her from the Begay residence to her own home in order to check on her children. Our review of the record, however, confirms that the district court's determination regarding custody was not erroneous.

**[1]** Charley's illegal arrest claim rests on Sergeant Billie's testimony that he "detained" Charley when he picked her up from the Begay residence and took her back to her house to check on her children. Charley is essentially arguing that "detaining" is tantamount to "arresting," but as the Supreme Court's and our precedents make clear, not every detention by law enforcement officials amounts to arrest or custody under the Fourth Amendment. Arrests and detentions are both "seizures" under the Fourth Amendment, but only the former requires a showing of probable cause, while the latter can be justified by reasonable suspicion of criminal activity. *Brown v. Texas*, 443 U.S. 47, 51 (1979) (citing *Terry v. Ohio*, 392 U.S. 1, 25-26 (1968)).

**[2]** There is no question that, based on objective facts, Sergeant Billie had the requisite reasonable suspicion to justify detaining Charley until he could determine whether anything had happened to her children, and what she had done prompting her to tell dispatch, Sergeant Billie, and others that she had "done something bad." *See Brown*, 443 U.S. at 51. The dispositive question is whether Sergeant Billie's conduct in placing Charley in his car and escorting her back to her house amounted to an arrest that he lacked the probable cause to make.

No "litmus-paper test" exists for "determining when a seizure exceeds the bounds of an investigative stop." *Florida v. Royer*, 460 U.S. 491, 506 (1983); *Eberle v. City of Anaheim*, 901 F.2d 814, 819 (9th Cir. 1990). Instead, we examine the "totality of the circumstances" in deciding "whether an investigative detention has ripened into an arrest." *Eberle*, 901 F.2d at 819. Our inquiry focuses on the perspective of the person seized, rather than the subjective beliefs of the law enforcement officers. *Id.* "The question is thus whether a reasonable innocent person in [the same] circumstances would not have felt free to leave after brief questioning." *Id.* (internal quotation marks omitted).

**[3]** "[T]here is no per se rule that detention in a patrol car constitutes an arrest." *United States v. Torres-Sanchez*, 83 F.3d 1123, 1127 (9th Cir. 1996). Furthermore, we have held that the police may move a suspect without exceeding the bounds of an investigative detention when it is a reasonable means of achieving the legitimate goals of the detention "given the specific circumstances" of the case. *Gallegos v. City of Los Angeles*, 308 F.3d 987, 991 (9th Cir. 2002); *see also Halvorsen v. Baird*, 146 F.3d 680, 684-85 (9th Cir. 1998) (upholding jury finding that investigative stop did not become an arrest where § 1983 plaintiff was cuffed and taken from his home to a nearby gas station for questioning and then involuntarily committed in a detoxification facility overnight because jury could conclude that police had determined that it was hard to talk or unsafe to remain in the original location); *cf. Royer*, 460 U.S. at 504-05 ("[T]here are undoubtedly reasons of safety and security that would justify moving a suspect from one location to another during an investigatory detention . . . .").[4]

---

[4]Our view that there may be certain, case-specific circumstances where law enforcement officers can move a suspect from one location to another without crossing the line between an investigative stop and an arrest finds support in a leading treatise on the Fourth Amendment. 4 Wayne R. LaFave, Search & Seizure: A Treatise on the Fourth Amendment § 9.2(g) (4th ed. 2004) ("[I]t seems clear that some movement of the suspect in the general vicinity of the stop is permissible without converting what would otherwise be a temporary seizure into an arrest."). It is also consistent with the approach followed by the majority of our sister circuits. *See United States v. Montano-Gudino*, 309 F.3d 501, 504 (8th Cir. 2002) (holding that there was no arrest where officers escorted defendant who was in the process of emptying his rented storage unit to a room in the storage facility offices for questioning); *United States v. Gori*, 230 F.3d 44, 56 (2d Cir. 2000) ("[I]t is well established that officers may ask (or force) a suspect to move as part of a lawful *Terry* stop."); *United States v. Vega*, 72 F.3d 507, 515-16 (7th Cir. 1995) (holding that defendant's stop was "not tantamount to an arrest" notwithstanding that "the officers drew their weapons, asked [the defendant] to accompany them [back to the crime scene] in one of their cars," and kept him in the officer's vehicle for over an hour); *United States v. Bueno*, 21 F.3d 120, 124 (6th Cir. 1994) (holding that

In *Gallegos*, 308 F.3d at 989-91, police officers pulled over a man they mistakenly believed to be a burglary suspect, ordered him out of his vehicle at gunpoint, handcuffed him, and placed him in the back of their patrol car. They then brought him to the scene of the reported incident, where they confirmed that he was not the suspect. The detainee brought a § 1983 action against the police alleging that they had violated his Fourth Amendment rights by arresting him without probable cause. The district court granted summary judgment for the defendants, and we affirmed, holding that the police conduct at issue "did not exceed the bounds of a valid investigatory stop," because the purpose of the stop was for the police "to make sure that they ha[d] the right person," and cuffing the plaintiff and bringing him to the alleged crime scene was "not, under the circumstances, an unreasonable way of finding out if [the plaintiff] was the person they were looking for." *Id.* at 991, 993.

---

conduct of airport police in moving suspect from main concourse to a secured hallway "did not exceed the limited restraint permitted for an investigative stop"); *United States v. Nurse*, 916 F.2d 20, 24-25 (D.C. Cir. 1990) (holding that officers' conduct in preventing defendant from getting into a taxi and escorting her back into the train terminal did not "exceed[ ] the established bounds for reasonable suspicion detentions"); *United States v. Kapperman*, 764 F.2d 786, 792 (11th Cir. 1985) ("Once [the defendant] consented to the search, it cannot reasonably be asserted that moving the investigation or requiring him to ride in the patrol car to a nearby place where the search would be conducted converted a lawful investigatory stop into an arrest."); *United States v. Self*, 410 F.2d 984, 986 (10th Cir. 1969) (holding that there was no arrest where officer drove defendants to a parking lot and then to the police station because the officer "was reasonably investigating the suspicious behavior of the defendants" and the defendants had "willingly complied with the detective's request that they accompany him"); *cf. United States v. Petty*, 601 F.2d 883, 886, 889 (5th Cir. 1979) (addressing different Fourth Amendment issue but characterizing seizure where border patrol vehicles escorted defendants' vehicle to a border patrol office as an "investigative stop" and stating that the defendants "were not under arrest at th[e] time" of this move).

**[4]** Relying on *Gallegos*, we hold that the district court did not err in finding that Charley was not in custody when Sergeant Billie detained her and escorted her from the Begay residence to her own home. The evidence before the district court supports that it was reasonable for Sergeant Billie to detain Charley in his car for investigation as he drove to her home to determine why she had called dispatch and the reason for her distress. Sergeant Billie had reasonable suspicion justifying an investigative detention, and the investigative methods he employed were far less intrusive and coercive than the methods we concluded were within the bounds of a reasonable, investigatory stop in *Gallegos*. Sergeant Billie testified that he "detained" Charley at the Begay residence, and that she was not free to leave until he found out what was going on with her children, but he also testified that he had expressly told Charley that she was "not under arrest," and there is no evidence that he used any kind of force against Charley. On the contrary, the record shows that Charley not only voluntarily accompanied Sergeant Billie to her home, but that she repeatedly insisted that they go there to check on her children. Because the record belies Charley's allegation that Sergeant Billie arrested her at the Begay residence, Charley cannot suppress any statements she made on January 1, 2002, on the grounds that they were the fruit of an illegal arrest, or were incurably tainted by the same.[5] Charley was not in cus-

---

[5]Although Charley cites the Supreme Court's decision in *Dunaway v. New York*, 442 U.S. 200 (1979), in support of her claim of illegal arrest, the facts and legal arguments in *Dunaway* are wholly inapposite to those presented in this case. In *Dunaway* there was no dispute as to whether the defendant was in custody. *Id.* at 203, 206. Rather, the government was urging the Supreme Court to hold that "mere reasonable suspicion" could justify *any* seizure short of a formal arrest. *Id.* at 211-13. The Supreme Court rejected this invitation, holding that the more stringent probable cause requirement applied to all seizures falling outside the category of investigative stops, not just those seizures that were officially termed arrests. *Id.* at 212-13. Unlike in *Dunaway*, the government contends here that Charley's detention was an investigative stop, and the factual record supports this contention and the district court's determination that Charley was not in custody when Sergeant Billie drove her to her home to investigate.

tody until after Sergeant Billie found the dead children at her home.

## B

**[5]** Charley claims that the district court erred in failing to suppress statements that she made during her January 3, 2002, interview by Agent Purscell. According to Charley, this statement should have been suppressed because it was made after she invoked her Fifth Amendment right to counsel pursuant to *Edwards v. Arizona*, 451 U.S. 477 (1981). *Edwards* stands for the proposition that the police cannot subject an accused who invokes his or her Fifth Amendment right to counsel to further interrogation until counsel is made available to the accused or the accused initiates further communication with the police. *Id.* at 484-85. As the government points out, however, the transcript from Charley's tribal court arraignment only reflects that she invoked her Sixth Amendment right to have counsel represent her in tribal court proceedings. Invocation of the Sixth Amendment right to counsel alone does not constitute an invocation of the *Miranda-Edwards* Fifth Amendment right to counsel. *McNeil v. Wisconsin*, 501 U.S. 171, 177-82 (1991). Under the authority of *McNeil*, Charley's argument that her Fifth Amendment right to counsel was violated by Agent Purscell's second interrogation must fail.

Even if Charley never invoked her Fifth Amendment right to counsel, the inquiry does not end here: If Charley effectively invoked her Sixth Amendment right to counsel with respect to the murders of her children, the police were still constitutionally barred from interrogating her about the murders outside the presence of counsel because "[t]he Sixth Amendment guarantees the accused, at least after the initiation of formal charges, the right to rely on counsel as a 'medium' between him and the State." *Maine v. Moulton*, 474 U.S. 159, 176 (1985).

**[6]** The Sixth Amendment right to counsel "does not attach until a prosecution is commenced." *McNeil*, 501 U.S. at 175. In other words, it attaches "at or after the initiation of adversary judicial criminal proceedings — whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Id.* Here, Charley's Sixth Amendment right to counsel was not triggered until she had her initial appearance in federal court on January 3, 2002. That Charley was arraigned in tribal court on January 2, 2002, is irrelevant to determining when her Sixth Amendment right to counsel attached because we have squarely held that "the Sixth Amendment right to counsel does not apply in tribal court criminal proceedings." *United States v. Percy*, 250 F.3d 720, 725 (9th Cir. 2001).[6] The district court properly denied Charley's motion to suppress her January 3, 2002 statements because Charley had not invoked her Fifth Amendment right to counsel, and her Sixth Amendment right to counsel had not yet attached when she made her request for an attorney before the tribal court.

---

[6]*United States v. Bird*, 287 F.3d 709 (8th Cir. 2002), finding that the Sixth Amendment right attached following a tribal arraignment, is not to the contrary. That decision involved a degree of cooperation so extensive between federal and tribal authorities that one could not separate the federal and tribal proceedings:

> [A]s a result of the way that tribal and federal authorities cooperated in connection with these charges, Red Bird's indictment in tribal court inherently led to his prosecution in federal court. Considering the close working relationship between tribal and federal authorities in this case, to deny Red Bird the right to counsel after the tribal indictment would deprive him of an attorney at one of the most critical stages of the proceedings against him.

*Id.* at 714. This case presents no such circumstances. Absent the collusive behavior in *Bird*, our precedent that the "Sixth Amendment right to counsel does not apply in tribal court criminal proceedings," *Percy*, 250 F.3d at 725, stands. We have no occasion to decide whether, in factual circumstances like those in *Bird*, we would reach the result reached in *Bird*.

## III

We conclude that the district court did not err in holding that Charley was not in custody when Sergeant Billie detained her at the Begay residence and brought her to her own home to investigate what had happened to her children. We also hold that the district court did not err in denying Charley's motion to suppress her statements to Agent Purscell because Charley's right to counsel was not violated.

**AFFIRMED.**