**NOT FOR PUBLICATION**

**FILED**

UNITED STATES COURT OF APPEALS

DEC 30 2025

FOR THE NINTH CIRCUIT

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| SARAY ORTIZ, an individual, on behalf of herself and all others similarly situated, | No. 25-2207 |
| Plaintiff-Appellee | D.C. No. 2:24-cv-06013-DDP-JC |
| v. | MEMORANDUM[*] |
| UNIVERSITY CREDIT UNION, | |
| Defendant-Appellant. | |

Appeal from the United States District Court
for the Central District of California
Dean D. Pregerson, District Judge, Presiding

Submitted December 9, 2025[**]

Before: M. SMITH, CHRISTEN, and FORREST, Circuit Judges.

Defendant University Credit Union (UCU) appeals from the district court's order denying its motion to compel arbitration. According to UCU, the district court erroneously held (1) that UCU failed to provide Plaintiff Saray Ortiz notice of its arbitration agreement, and (2) that Ortiz did not unequivocally assent to such

---

[*] This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

[**] The panel unanimously concludes that this case is suitable for decision without oral argument. *See* Fed. R. App. P. 34(a)(2).

agreement. On both issues, we agree with UCU.

The parties are familiar with the facts, so we do not recount them here except as necessary for context. With jurisdiction under 9 U.S.C. § 16(a)(1)(C), we review the district court's order de novo. *Patrick v. Running Warehouse, LLC*, 93 F.4th 468, 475 (9th Cir. 2024). We reverse and remand.

In assessing whether parties have entered into a valid agreement to arbitrate, we apply "state-law principles of contract formation." *Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 510 (9th Cir. 2023) (internal quotations omitted). The parties agree that California law applies. This court, applying California law, has set out a two-part test for gauging an online arbitration agreement's validity based on a theory of constructive notice: (1) the website must provide "reasonably conspicuous notice of the terms to which the [user] will be bound"; and (2) the user must take "some action, such as clicking a button or checking a box, that unambiguously manifests . . . her assent to those terms." *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022). UCU satisfied both elements, and we therefore hold that the parties entered into a valid agreement to arbitrate.

1. UCU's online webform provided Ortiz reasonably conspicuous notice of the arbitration terms. This element turns largely on the website's "design and content." *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1177 (9th Cir. 2014). The inquiry is "fact-intensive" and considers such factors "as the size, color, contrast,

and location of any text notices; the obviousness of any hyperlinks; and overall screen 'clutter.'" *B.D. v. Blizzard Ent., Inc.*, 76 Cal. App. 5th 931, 947 (2022). "[T]o be conspicuous," a contract notice "must be displayed in a font size and format" that we can fairly assume would cause "a reasonably prudent Internet user" to see it. *Berman*, 30 F.4th at 856. Website providers can disclose contract terms via hyperlink, but the link's presence "must be readily apparent." *Id.* at 857. "Customary design elements denoting the existence of a hyperlink include the use of a contrasting font color (typically blue) and the use of all capital letters." *Id.*

The "design and content" of UCU's webform provided users reasonably conspicuous notice of the arbitration terms. As shown below, the form's reference to a "**Member Agreement**" is bold, set against a white background, placed in the center of the screen, and "displayed in a font size" relative to the surrounding text "that a reasonably prudent Internet user would have seen." *Id.* at 856. The screen also references the Member Agreement twice. Although the form references other contracts as well, "[t]he notice is on an uncluttered page and is not hidden or obscured," but is instead "clear and legible." *Patrick*, 93 F.4th at 477. Heightening the contract reference's conspicuousness is the fact that, before a user can complete the webform, she must affirmatively acknowledge the contract by selecting a checkbox adjacent the Member Agreement reference. This mechanism is likely to draw a user's attention toward the reference.



The agreement's hyperlink is also conspicuous. Immediately beneath the contract reference reads the sentence: "I agree with <u>University Credit Union's Member Agreement</u>." This sentence hyperlinked the arbitration terms, using blue, underscored text, "distinguished from the surrounding [black and gray] text," on an uncluttered screen. *Oberstein*, 60 F.4th at 516. The use of blue, underscored text is akin to the "[c]ustomary" design of blue, capitalized text. *Berman*, 30 F.4th at 857; *see also Patrick*, 93 F.4th at 477 (holding green hyperlinks on uncluttered webpage sufficient, even without capitalization or underlining).[1]

---

[1] Embedded behind the hyperlink was a lengthy set of terms and conditions, the first section of which comprised an "Agreement to Arbitrate."

Despite all these indicia of conspicuousness, the district court thought UCU's hyperlink inadequate because it "appears in the latter half of a sentence" beginning with "light gray text," and was not positioned "directly on top of or below" the "Agree" button. Neither concern gives us pause. True, the gray text is small and dim; yet none is especially salient.[2] Even without reading the gray text, a reasonable user would have understood from the screen's design and remaining content that it referenced and solicited consent to hyperlinked legal terms. As just mentioned, the form requires users to select a checkbox labeled "Member Agreement" before pressing a button labeled "Agree"—unmistakably requesting users' "Agree[ment]" to that "Member Agreement." On these facts, the Agree button's placement a few lines apart from the contract reference is inconsequential.

The district court also criticized UCU's webform for placing "nearly half of the words" on the screen in hyperlinks. Yet that did not have the effect of rendering the link inconspicuous either. On the contrary, the use of multiple hyperlinks on a given page—each corresponding to a given contract, each set out in "the same color as other clickable links on the page"—increases the odds that a user will recognize

---

[2] The gray text atop the screen states: "Please check the boxes after reviewing the agreements below." But the page's design and other content leave no doubt that the page contained hyperlinked agreements to which UCU sought consent. Similarly, the gray "I agree with" statements preceding each hyperlink are redundant. Users could not proceed to the next screen without selecting checkboxes corresponding to each contract, then selecting a button labeled "Agree."

the links as such. *Patrick*, 93 F.4th at 477.

Nor does Ortiz's reliance on cases declining to enforce "browsewrap" and "sign-in wrap" agreements help her cause. *See Nguyen*, 763 F.3d at 1174, 1177–79 (involving "browsewrap"); *Berman*, 30 F.4th at 856–58 (involving "browsewrap-type agreement"); *Godun v. JustAnswer LLC*, 135 F.4th 699, 708–13 (9th Cir. 2025) (involving "sign-in wrap"); *Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444, 465 (2021) (same). As the district court recognized, UCU's webform more closely resembles a "clickwrap" agreement, which courts "routinely" enforce. *Berman*, 30 F.4th at 856; *see also Oberstein*, 60 F.4th at 517 ("To ensure that an online agreement passes muster, clickwrap is the safest choice.").[3]

2.      Ortiz unequivocally assented to the arbitration agreement. One can manifest assent to a contract by engaging in conduct she "knows or has reason to know that the other party" may regard as assent. *Berman*, 30 F.4th at 855 (quoting Restatement (Second) of Contracts § 19(2) (1981)). "[C]lickwrap represents 'the clearest manifestations of assent'" when online agreements are involved. *Oberstein*, 60 F.4th at 514 (citation omitted). With clickwrap, a user receives notice of the contract terms then engages in conduct she knows the website provider will regard

---

[3] UCU argued on reply that the district court also failed to consider the "full context of the transaction." *See Sellers*, 73 Cal. App. 5th at 477. This issue is twice forfeited, however, as UCU failed to raise it before the district court and again in its opening brief. *See Bolker v. Comm'r*, 760 F.2d 1039, 1042 (9th Cir. 1985); *Eberle v. City of Anaheim*, 901 F.2d 814, 818 (9th Cir. 1990).

as assent, such as "check[ing] a box explicitly stating 'I agree' in order to proceed." *Berman*, 30 F.4th at 856.

That is the case here. UCU's webform provided Ortiz sufficient notice of the hyperlinked Member Agreement, required her to check a box acknowledging the Member Agreement, and then required her to select an "Agree" button. Ortiz concedes that she followed these steps. There is nothing ambiguous about her conduct: Ortiz "Agree[d]" to the "Member Agreement."

The district court nonetheless found assent lacking due to the small, gray font. However, the first batch of gray font is insignificant, and the second batch is redundant. *Supra* at 5 & note 2. The court also deemed the gray "I agree with" statements "materially indistinguishable" from the language "found lacking in *Berman*." Putting aside that *Berman* involved a "browsewrap-type agreement," 30 F.4th at 857–58, we do not read that decision to find "lacking" the language invoked by the district court. Rather, the webform's shortcoming resided in its failure to "explicitly notify" users that clicking a large "Continue" button, which on its face merely prompted users to move to the next screen, triggered users' agreement to terms and conditions referenced elsewhere in "tiny gray font." *Id.* at 854, 857–58. Given the lack of express notice, a reasonable user might not have known that by selecting the "Continue" button, she was relinquishing legal rights. *See id.* UCU's webform suffers from no comparable shortcoming. Unlike the "Continue" button in

*Berman*, UCU's "Agree" button *itself* informed users like Ortiz that they were "Agree[ing]" to the Member Agreement just acknowledged.

3.     Having determined that a valid arbitration agreement exists, we now consider "whether the agreement encompasses the dispute at issue." *Davis v. Nordstrom, Inc.*, 755 F.3d 1089, 1092 (9th Cir. 2014).   We have no trouble concluding it does.  The parties' agreement provides that "any and all" disputes incapable of informal resolution and "arising out of, affecting, or relating to [Ortiz's] accounts," to "the products or services" UCU provides, or to Ortiz's "relationship" with UCU "shall . . . be resolved by binding arbitration . . . ."  Ortiz's discrimination claims are based on UCU's denial of her application for an auto loan after she opened "a checking account with UCU," which Ortiz concedes was a prerequisite to seek financing from UCU.  Ortiz's claims thus arise out of and relate to her "accounts" with UCU, to UCU's "products and services," and to the parties' "relationship."  Her claims therefore fit well within the scope of the parties' agreement to arbitrate. When UCU argued as much in the district court, Ortiz offered no response.

* * *

Accordingly, we **REVERSE** the district court's order denying UCU's motion to compel arbitration and **REMAND** for the district court to stay the matter and compel arbitration.  *See* 9 U.S.C. § 3.