**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| WANDA JOHNSON, individually and as personal representative of the Estate of Oscar J. Grant, III; ESTATE OF OSCAR J. GRANT III; SOPHINA MESA, as Guardian ad Litem of minor, T.G.; JACK BRYSON, JR.; NIGEL BRYSON; MICHAEL GREER; CARLOS REYES; FERNANDO ANICETE, JR.; OSCAR JULIUS GRANT, JR.; JOHNTUE CALDWELL (now deceased), *Plaintiffs-Appellees*, <br><br> v. <br><br> BAY AREA RAPID TRANSIT DISTRICT; GARY GEE, in his official capacity as chief of police for BART; DOROTHY DUGGER, in her official capacity as general manager for BART; ANTHONY PIRONE, individually and in his official capacity as a police officer for BART; MARYSOL DOMENICI, individually and in her official capacity as a police officer for BART; DOES 1-50, *Defendants*, | No. 11-16456 <br><br> D.C. Nos. <br> 3:09-cv-00901-EMC <br> 3:09-cv-04014-EMC <br> 3:09-cv-04835-EMC <br> 3:10-cv-00005-EMC |

and

JOHANNES MEHSERLE,
individually and in his official
capacity as a police officer for
BART,

*Defendant-Appellant.*

---

WANDA JOHNSON, individually
and as personal representative of
the Estate of Oscar J. Grant, III;
ESTATE OF OSCAR J. GRANT III;
SOPHINA MESA, as Guardian ad
Litem of minor, T.G.; JACK
BRYSON, JR.; NIGEL BRYSON;
MICHAEL GREER; FERNANDO
ANICETE, JR.; CARLOS REYES;
OSCAR JULIUS GRANT, JR.;
JOHNTUE CALDWELL (now
deceased),

*Plaintiffs-Appellees*,

v.

BAY AREA RAPID TRANSIT
DISTRICT; GARY GEE, in his
official capacity as chief of
police for BART; DOROTHY
DUGGER, in her official capacity
as general manager for BART;
JOHANNES MEHSERLE,
individually and in his official
capacity as a police officer for

No. 11-16480

D.C. Nos.
3:09-cv-00901-EMC
3:09-cv-04014-EMC
3:09-cv-04835-EMC
3:10-cv-00005-EMC

BART; MARYSOL DOMENICI,
individually and in her official
capacity as a police officer for
BART; DOES 1-50,
                    *Defendants*,


and


ANTHONY PIRONE, individually
and in his official capacity as a
police officer for BART,
                    *Defendant-Appellant*.


WANDA JOHNSON, individually
and as personal representative of
the Estate of Oscar J. Grant, III;
ESTATE OF OSCAR J. GRANT III;
SOPHINA MESA, as Guardian ad
Litem of minor, T.G.; JACK
BRYSON, JR.; NIGEL BRYSON;
MICHAEL GREER; FERNANDO
ANICETE, JR.; CARLOS REYES;
OSCAR JULIUS GRANT, JR.;
JOHNTUE CALDWELL (now
deceased),
                    *Plaintiffs-Appellees*,


v.


BAY AREA RAPID TRANSIT
DISTRICT; GARY GEE, in his
official capacity as chief of

No. 11-16481

D.C. Nos.
3:09-cv-00901-EMC
3:09-cv-04014-EMC
3:09-cv-04835-EMC
3:10-cv-00005-EMC


OPINION

police for BART; DOROTHY
DUGGER, in her official capacity
as general manager for BART;
JOHANNES MEHSERLE,
individually and in his official
capacity as a police officer for
BART; ANTHONY PIRONE,
individually and in his official
capacity as a police officer for
BART; DOES 1-50,
                    *Defendants*,


                    and


MARYSOL DOMENICI,
individually and in her official
capacity as a police officer for
BART,
                    *Defendant-Appellant*.

Appeal from the United States District Court
for the Northern District of California
Marilyn H. Patel, Senior District Judge, Presiding

Argued and Submitted
December 3, 2012—San Francisco, California

Filed July 30, 2013

Before:  Michael Daly Hawkins, A. Wallace Tashima, and
Mary H. Murguia, Circuit Judges.

Opinion by Judge Murguia

# SUMMARY[*]

## Civil Rights

The panel affirmed in part, vacated in part, and reversed in part the district court's denial in part of qualified immunity to Bay Area Rapid Transit police officers, and dismissed a portion of one officer's appeal, in two civil rights suits arising from an encounter on a train platform that ended with the shooting and death of Oscar Grant III.

Grant's friends who were involved in the encounter, Nigel Bryson, Jack Bryson, Jr., Carlos Reyes, Michael Greer, and Fernando Anicete, Jr., brought suit alleging that transit officers Mehserle, Pirone and Domenici committed various violations of the United States Constitution and state law by detaining and arresting them and holding them handcuffed at the BART police headquarters overnight after shooting Grant. Grant's father filed a separate complaint alleging that the officers violated his right to a familial relationship with his son.

The panel first held that Mehserle was not entitled to qualified immunity from Grant's father's Fourteenth Amendment claim for deprivation of a familial relationship. The panel declined Mehserle's invitation to find, as a matter of law, that Grant and his father lacked a sufficiently strong father–son bond to support the claim. The panel further determined that given the factual dispute as to whether Mehserle's actions were required by a legitimate law

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

enforcement purpose, the district court could not have properly granted Mehserle qualified immunity. The panel therefore affirmed the district court's judgment as to the Fourteenth Amendment claim.

Citing *Liberal v. Estrada*, 632 F.3d 1064 (9th Cir. 2011), the panel determined that it lacked jurisdiction to review the district court's judgment denying Mehserle qualified immunity from the plaintiffs' California Civil Code § 52.1 claim, and dismissed that portion of Mehserle's appeal.

Reversing the judgment, the panel held that Mehserle was entitled to qualified immunity from Anicete's unlawful arrest claim because there was no evidence that he played any part in the arrest.

The panel held that the district court relied improperly on *Dubner v. City and County of San Francisco*, 266 F.3d 959 (9th Cir. 2001), in denying Mehserle qualified immunity as to Anicete's, Reyes's and Nigel Bryson's extended detention claims at BART police headquarters, and therefore vacated the judgment, with instructions that on remand, the district court should determine whether there was any evidence that Mehserle was responsible for those extended detentions.

Affirming the district court, the panel held that: (1) Mehserle was not entitled to qualified immunity from Jack Bryson's unlawful arrest claim; (2) Pirone was not entitled to qualified immunity from Reyes's, Greer's and the Brysons' claim for unlawful detention given the questionable nature of Pirone's authority to detain the group for a misdemeanor that abated before his arrival; (3) Pirone was not entitled to qualified immunity from Reyes's and the Brysons' claim that he conducted a de facto arrest, without the requisite probable

cause, by drawing his Taser; (4) Pirone was not entitled to qualified immunity for arresting Greer for his refusal to accede to the unlawful detention.

Finally, the panel held that to the extent the district court relied solely on *Dubner* to deny Domenici immunity from any of the plaintiffs' claims, the judgment was vacated and on remand the district court should reconsider its decision in accordance with the panel's opinion. To the extent the district court relied upon disputed facts to deny Domenici immunity, the panel stated that it lacked jurisdiction to review that denial.

## COUNSEL

Michael L. Rains (argued) and Lara Cullinane-Smith, Rains Lucia Stern, PC, Pleasant Hill, California, for Defendant–Appellant Johannes Mehserle.

Donald T. Ramsey (argued), Law Offices of Donald T. Ramsey, San Francisco, California; William R. Rapoport, Law Offices of William R. Rapoport, Redwood City, California, for Defendant–Appellant Anthony Pirone.

Alison Berry Wilkinson (argued), Berry Wilkinson Law Group, Inc., San Rafael, California, for Defendant–Appellant Marysol Domenici.

John L. Burris (argued) and Adanté D. Pointer, Law Offices of John L. Burris, Oakland, California; Dan Siegel (argued) and Dean Royer, Siegel & Yee, Oakland, California, for Plaintiffs–Appellees Fernando Anicete, Jr., Jack Bryson, Jr., Nigel Bryson, and Carlos Reyes.

Panos Lagos, Law Offices of Panos Lagos, Oakland, California, for Plaintiff–Appellee Oscar Julius Grant, Jr.

**OPINION**

MURGUIA, Circuit Judge:

In the early morning hours of January 1, 2009, on a train platform in Oakland, an encounter between a group of young men and several officers of the Bay Area Rapid Transit ("BART") police ended with the shooting and death of Oscar Grant III and the allegedly unconstitutional detentions of Grant's friends, Nigel Bryson, Jack Bryson, Jr., Carlos Reyes, Michael Greer, and Fernando Anicete, Jr. A train full of witnesses observed the encounter; several made video recordings that were replayed widely in the news media and made available on the Internet. Johannes Mehserle, the BART police officer who shot and killed Grant, was convicted criminally for his role in the incident, which also gave rise to several civil suits against Mehserle and the other officers involved in the morning's events. Two of those suits are the source of the interlocutory appeals now before us.

The Brysons, Reyes, Greer, and Anicete filed a complaint against Mehserle, as well as against Anthony Pirone—the officer who first detained the group—and Pirone's partner, Marysol Domenici.[1] Among other things, their complaint alleged, under 42 U.S.C. § 1983, that the officers committed various violations of the United States Constitution that

---

[1] The Brysons, et al., also sued other officers and advanced other theories of liability, none of which are relevant to the matter now before the Court, and are therefore not part of our analysis.

morning. Grant's father, Oscar Grant, Jr., filed a separate complaint alleging Mehserle, Pirone, and Domenici violated his right to a familial relationship with his son.[2] Mehserle, Pirone, and Domenici each moved for summary judgment, arguing that they are entitled to qualified immunity—that is, to be shielded from claims arising out of their policework—from all the plaintiffs' claims. The district court denied the officers qualified immunity, at least in part. The officers appealed those denials immediately.

Our jurisdiction over these appeals is limited: we may review only the district court's legal conclusion that an officer is not entitled to qualified immunity. *Johnson v. Jones*, 515 U.S. 304, 319–20 (1995); *Eng v. Cooley*, 552 F.3d 1062, 1067 (9th Cir. 2009); *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1060 (9th Cir. 2006). "Our jurisdiction . . . does not extend to qualified immunity claims involving disputed issues of material fact." *KRL v. Estates of Moore*, 512 F.3d 1184, 1188–89 (9th Cir. 2008). For the reasons that follow, we AFFIRM in large part the district court's ruling, VACATE it in small part, REVERSE it in smaller part, and remand for further proceedings consistent with this opinion.

## I.

Resolving any disputed facts in the plaintiffs' favor (as we must), *Scott v. Harris*, 550 U.S. 372, 378 (2007), the following events occurred over the span of 12 minutes, early on New Year's Day, 2009.

---

[2] Grant's mother, daughter, and estate settled their claims arising out of this incident.

**1:59:21 A.M.**

Keecha Williams operated an eastbound BART train, carrying New Year's revelers out of San Francisco and across the Bay. Shortly before Williams's train pulled into Oakland's Fruitvale Station, a passenger used the train's emergency intercom to report a fight in the train's lead car. Williams relayed the passenger's report to BART dispatch, which instructed Williams to stop the train at Fruitvale and wait for the police.

Officer Pirone was dispatched to the Fruitvale platform with information that the troublemakers on Williams's train were a group of black males, in the lead car, wearing dark clothing. Dispatch also told Pirone that no weapons were used in the fight.

**2:04:00 A.M.**

Arriving on the platform, Pirone passed through a group of people loosely fitting the description of the alleged combatants and headed towards another group, also fitting that description, whose members were standing and talking on the platform near the train's lead car. Pirone approached the men and, as he said when later questioned, unholstered his Taser in an effort to intimidate them. Three of the men—the Brysons and Reyes—began to walk toward the stairs and the station exit, behind Pirone. Pirone asked the men to stop, but they continued to walk toward the exit. He then commanded them to "sit the [expletive] down," and they did. In the meantime, two other members of the group, Grant and Greer, stepped back aboard the train. Pirone radioed his partner, Officer Domenici, who jogged up to the platform, drew her

own Taser, and assumed watch over Reyes and the Brysons so Pirone could search for Grant and Greer.

### 2:06:33 A.M.

Pirone was pacing the platform, yelling "get the [expletive] off my train," when he spotted Grant through one of the train's windows. He pointed his Taser at Grant through the glass, prompting Grant to maneuver his way out of the car and on to the platform. Pirone led Grant to the wall where Reyes and the Brysons sat, and then returned to the train to search for Greer. Pirone located Greer shortly and demanded he get off the train. When Greer failed to comply with Pirone's order, Pirone grabbed him by the shirt and dragged him from the train, pushing him to the wall where the other men were seated. Greer extended his arms to avoid striking the wall, and then turn to face Pirone. Pirone described Greer's position as "a combative stance," purportedly justifying his response: Pirone grabbed Greer by the hair and swept his legs from under him, dropping him to the station floor. Pirone moved to handcuff Greer.

### 2:08:06 A.M.

Alarmed by Pirone's treatment of Greer, Jack Bryson stood and protested, exchanging profanities with Domenici. Grant stood between Domenici and Bryson, extending a hand between them and imploring Bryson to remain calm. Pirone, claiming to have seen Grant touch Domenici, leapt from Greer's side, punched Grant in the head, and slung him to the floor.

**2:08:36 A.M.**

Other passengers, including the detainees' friend, Anicete, stepped from the idling train, protesting Pirone's actions. Officer Mehserle and Officer Jon Woffinden (who is not a party to the appeals before us) sprinted on to the platform. Seeing Pirone and Domenici with their Tasers drawn, Mehserle removed his Taser from its holster on the left side of his body—the side opposite his gun. Pirone walked away from the assembled group of officers and detainees, leaving the officers to keep watch without having said anything to anyone about why he detained the group in the first place.

"What do we have here," Pirone asked Williams, as he arrived at the operator's booth at the front of the train's lead car. "Some BS," Williams replied, referring to problems, like fighting, that occur on BART trains on New Year's Eve. Pirone did not inquire further, and Williams said nothing else. Pirone returned to the assembled officers and detained men.

**2:09:53 A.M.**

Walking back towards the group, Pirone pointed a finger at the seated men, and generally at Grant, ordering Mehserle to arrest "him and him" for "148" (California Penal Code § 148—misdemeanor resistance, delay, or obstruction of an officer in the conduct of his duties). Mehserle thought Pirone meant for him to arrest Grant and Jack Bryson; Pirone actually meant for Mehserle to arrest Grant and the already-handcuffed Greer. Mehserle began to handcuff Bryson. Bryson argued with Mehserle, who threatened to use his Taser if Bryson continued to resist.

### 2:10:19 A.M.

Bryson capitulated, kneeled, and put his hands behind his back. Mehserle handcuffed him. Mehserle then turned to Grant, who was seated to Mehserle's left and facing Pirone. Mehserle grabbed Grant, causing Grant to fall forward on to Reyes, who was sitting on the floor as Pirone ordered previously. Mehserle crouched behind Grant, and Pirone knelt in front of Grant. Reyes implored Pirone and Mehserle to get Grant off of him, and the two officers rolled Grant, face down, on to the station floor, with Grant's hands coming to rest underneath his body.

### 2:10:53 A.M.

Pirone then knelt on Grant's neck. Mehserle straddled Grant, trying to pull his hands out from under his prostrate body. Grant struggled, complaining that he was unable to breathe. Despite his struggling, Pirone was satisfied that Grant was subdued. Mehserle, however, stood, unholstered his gun, and directed Pirone to get back. Puzzled by Mehserle's request, Pirone stood, allowing onlookers who were recording the scene to see Grant's hands resting visibly behind his back.

### 2:11:00 A.M.

Another officer, Emery Knudtson (who also is not a party to these appeals), arrived on the platform. Knudtson saw Anicete pacing and cursing at the other officers, so Knudtson tackled and handcuffed him, applying extra pressure to Anicete's hip after Anicete complained of a preexisting injury there. As Anicete fell to the floor, he and Knudtson both heard a popping sound. Knudtson thought it was a

firecracker.  It was actually the sound of Mehserle shooting Grant in the back.

"You shot me," Grant repeated frantically.    "Oh, [expletive], I shot him," Mehserle exclaimed, raising his hands to his head.    Mehserle handcuffed the mortally wounded Grant and searched him.  He then removed the handcuffs and tried to stanch the blood flowing from the hole in Grant's back.

Knudtson dragged Anicete to the wall, putting him with the other detained men.  Reyes stood and attempted to leave, but Woffinden and Knudtson handcuffed him.  The other officers herded passengers back on to the train, attempting to clear the platform.

### 2:12:41 A.M.

The train's doors closed, and it pulled out of the Fruitvale Station.

\*          \*          \*

An unknown officer handcuffed Nigel Bryson, the last of the group of men who remained free.  Pirone had already handcuffed Greer, Mehserle handcuffed Jack Bryson, Knudtson handcuffed Anicete, and Knudtson and Woffinden handcuffed Reyes.  The Brysons, Reyes, Greer, and Anicete were then taken to BART police headquarters by unknown officers, at the command of police officials who are not parties to these appeals or the underlying lawsuit.  None of the young men were charged with any crime in connection with the morning's events, though all remained handcuffed in

holding rooms at the station for several hours. Grant was taken to the hospital, where he died.

## II.

### A.

Pursuant to 42 U.S.C. § 1983, Reyes, the Brysons, Greer, and Anicete sued Mehserle, Pirone, and Domenici for detaining them in violation of the Fourth Amendment; additionally, they claimed Mehserle, Pirone, and Domenici unlawfully arrested them, also in violation of the Fourth Amendment. All five men alleged a violation of California Civil Code § 52.1, the California state law analog to section 1983. Further, Anicete and Greer alleged that Pirone and Knudtson used unconstitutionally excessive force against them.

Separately, Oscar Grant, Jr. brought a Fourteenth Amendment claim alleging that Mehserle, Pirone, and Domenici deprived him of his familial relationship with his deceased son, "in violation of the rights, privileges, and immunities secured by the First, Fourth, and Fourteenth Amendments to the United States Constitution." Mehserle, Pirone, and Domenici filed motions for summary judgment, each seeking qualified immunity from the claims made against him or her.

### B.

In analyzing the officers' motions, the district court created a three-part chronology of the morning's events, granting or denying the officers immunity from the plaintiffs' claims depending on the point in time at which the claims

arose. The district court's first time period began when Pirone detained Reyes and the Brysons, the second began when Pirone ordered Mehserle to arrest "him and him," and the third encompassed the prolonged detentions of Reyes, the Brysons, and Anicete, beginning when Mehserle shot Grant.

The district court denied Pirone qualified immunity—for all three time periods—from Reyes's, the Brysons', Greer's, and Anicete's claims that Pirone both unlawfully seized and unlawfully arrested the group. The district court granted Mehserle and Domenici qualified immunity from the same claims during the first time period, but denied both of them immunity from the time Pirone ordered Mehserle to arrest "him and him," onward—that is, for the second and third time periods. Moreover, and specifically as to Jack Bryson's claim that Mehserle arrested him unlawfully, the district court's denial of qualified immunity was premised on its finding that there remained a triable issue of fact as to whether Mehserle reasonably mistook Pirone's command in arresting the wrong person. The district court also denied the officers qualified immunity from the men's claim under California Civil Code § 52.1. Finally, the district court denied Mehserle immunity from Oscar Grant, Jr.'s Fourteenth Amendment claim.

## C.

Mehserle asks us to determine whether the district court erred in denying him immunity from: (1) Oscar Grant, Jr.'s Fourteenth Amendment claim for deprivation of a familial relationship; (2) any claim under California Civil Code § 52.1; (3) Anicete's unlawful arrest claim; (4) claims arising from the extended detentions of Anicete, Reyes, and Nigel Bryson at BART police headquarters; and (5) Jack Bryson's

unlawful arrest claim. Pirone asks us to review the district court's decision to deny him immunity from: (1) the claim that he detained Reyes and the Brysons unlawfully; (2) the claim that, at some point, Pirone's detention of Reyes and the Brysons became a de facto unlawful arrest; and (3) Greer's unlawful arrest claim. Domenici seeks review of the district court's decision denying her immunity from the portion of Reyes's and the Brysons' unlawful detention claims arising out of their extended detentions at BART headquarters. Because this is an appeal from the denial of summary judgment, we adopt the view of any disputed facts most favorable to the plaintiffs—the one we have set forth, above—and then, premised upon those facts, review de novo the district court's denials of qualified immunity. *Karl v. City of Mountlake Terrace*, 678 F.3d 1062, 1067–68 (9th Cir. 2012).

## D.

When police officers are sued for their conduct in the line of duty, courts must balance two competing needs: "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

We apply a two-part test to determine which way the balance tips in a given case. *Id.* at 232; *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 915 (9th Cir. 2012) (en banc). We may begin with either part of the test, but typically, taking the facts in the light most favorable to the plaintiffs, we first ask whether those facts demonstrate that the defendant police officers violated one or more of the plaintiffs' constitutional

rights. *Pearson*, 555 U.S. at 236; *Maxwell v. Cnty. of San Diego*, 697 F.3d 941, 947 (9th Cir. 2012); *Lacey*, 693 F.3d at 915. If the answer to that question is "no," we stop: without a violation, there is no basis for the plaintiffs' lawsuit to proceed. *Id.*

If the answer to our first question is "yes," then for the second step, we call on a familiar character, the hypothetical "reasonable officer." The reasonable officer avoids committing acts that have been clearly established as unconstitutional—for example, handcuffing a prisoner to a fence for a long period of time—as well as other, similar acts, like handcuffing a prisoner not to a fence, but instead to a hitching post. *See Hope v. Pelzer*, 536 U.S. 730, 739–43 (2002) (holding that an act—there, handcuffing a shirtless inmate to a hitching post in the sun for seven hours—may be clearly established as unconstitutional even if there is no case addressing it specifically, as long as existing law provides "fair warning" that the act is unconstitutional); *Mattos v. Agarano*, 661 F.3d 433, 442 (9th Cir. 2011). Nevertheless, our reasonable officer sometimes makes mistakes—reasonable mistakes—of fact or law, and thereby commits an unconstitutional act. Though we may excuse the reasonable officer for such a mistake, *Pearson*, 555 U.S. at 231, it sometimes proves necessary for a jury to determine first whether the mistake was, in fact, reasonable, *Santos v. Gates*, 287 F.3d 846, 855 n.12 (9th Cir. 2002).

To complete the second step of the qualified immunity analysis, we place our hypothetical reasonable officer in the same situation as the defendant police officers, and then ask whether the reasonable officer also would have committed the act that the plaintiffs contend is unconstitutional. *Lacey*, 693 F.3d at 915. If the answer is "yes," the defendant officers

are entitled to qualified immunity. *Id.* If the answer is "no," the plaintiffs' claim against the defendant officers may proceed. *Id.*

## III.

## A.

## Johannes Mehserle

### 1. Mehserle is not entitled to immunity from Oscar Grant, Jr.'s Fourteenth Amendment claim.

Parents have a Fourteenth Amendment right to the companionship of a child, which a police officer violates by "act[ing] with a purpose to harm" the child "that [is] unrelated to legitimate law enforcement objectives." *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008). Oscar Grant, Jr. claims Mehserle violated his right to his child's companionship by shooting and killing his child; Mehserle seeks qualified immunity from that claim. The district court denied Mehserle this immunity, and we affirm.

Mehserle first argues that we should scrutinize the strength of the relationship between Grant and his father, and determine that they lacked a degree of familiarity sufficient to warrant a claim for loss of companionship. In a scant paragraph supporting this argument, Mehserle cites two cases. First, Mehserle cites the Seventh Circuit's opinion in *Russ v. Watts*, 414 F.3d 783 (7th Cir. 2005), which he describes as holding "that where a child had created a new life away from the parents, the parents were not entitled to a claim under the Fourteenth Amendment." Second, Mehserle cites our opinion in *Lee v. City of Los Angeles*, 250 F.3d 668,

685 (9th Cir. 2001), for the truism that a Fourteenth Amendment claim for loss of companionship is intended to protect "those relationships, including family relationships, that presuppose 'deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life.'" (internal citation omitted).

The upshot of *Russ*, however, is not that courts should determine, as a matter of law, that at some indeterminate point in time a child has created enough of a life away from home to strip his parents of their right to his companionship. It is instead that at some *determinate* point in time—when the child reaches the age of majority—his parents' Fourteenth Amendment right to his companionship is extinguished. *Russ*, 414 F.3d at 791. But that is not the argument Mehserle makes as to Grant's relationship with his father. *See Christian Legal Soc'y Chapter of Univ. of Cal. v. Wu*, 626 F.3d 483, 487–88 (9th Cir. 2010) (recalling previous admonishments that we decline to address arguments not made distinctly in an appellant's opening brief). Moreover, in past cases, we have recognized a parent's right to a child's companionship without regard to the child's age. *See Strandberg v. City of Helena*, 791 F.2d 744, 748 & n.1 (9th Cir. 1986) (recognizing, at least in passing, parents' right to the companionship and society of their deceased 22-year-old son); *see, e.g.*, *Lee*, 250 F.3d at 685–86 (holding that a mother successfully stated a violation of the Fourteenth Amendment by alleging that the Los Angeles Police Department recklessly deprived her of the companionship of her mentally disabled adult son); *Smith v. City of Fontana*, 818 F.2d 1411, 1419 (9th Cir. 1987) (describing *Strandberg* as recognizing a Fourteenth Amendment right of parents to the

companionship of adult children, because "the familial relationship, and not the more narrow custodial interest of the parents, gave rise to the due process action"), *overruled on other grounds by Hodgers-Durgin v. de la Vina*, 199 F.3d 1037 (9th Cir. 1999) (en banc); *see also Reynolds v. Cnty. of San Diego*, 858 F. Supp. 1064, 1070 (S.D. Cal. 1994) ("The parent's constitutionally-protected interest is not extinguished as a matter of law when an adult child leaves his parents' home and marries.").**[3]**  With no authority to support it, we decline Mehserle's invitation to find, as a matter of law, that Grant and his father lacked a sufficiently strong father–son bond to support the father's Fourteenth Amendment claim.**[4]**

Mehserle next contends that "the facts overwhelmingly show that [he] was acting consistently within the legitimate law enforcement objective of arresting Grant" at the time that

---

**[3]** Several of our sister circuits have held that a parent's protected interest in the companionship of his or her child, at least as far as the Constitution is concerned, ends when the child reaches the age of majority. *See, e.g.*, *Russ*, 414 F.3d at 791 (overruling a prior decision "insofar as it recognized a constitutional right to recover for the loss of the companionship of an adult child when that relationship is terminated as an incidental result of state action"); *McCurdy v. Dodd*, 352 F.3d 820, 830 (3d Cir. 2003) ("[W]e hold that the fundamental guarantees of the Due Process Clause do not extend to a parent's interest in the companionship of his independent adult child."); *Butera v. Dist. of Columbia*, 235 F.3d 637, 656 (D.C. Cir. 2001) ("[W]e hold that a parent does not have a constitutionally-protected liberty interest in the companionship of a child who is past minority and independent."). Should Mehserle raise this issue properly in the district court, and brief it in a future appeal, we may have occasion to consider it.

**[4]** That is not to say that the strength of a parent's relationship with a child has *no* bearing on the parent's claim for loss of the child's companionship. It is instead to say that the closeness of a parent's relationship with a child is a quintessential question of fact (and on this record, a disputed one).

he shot Grant in the back. We construe the facts, overwhelming or otherwise, in Grant's father's favor and ask whether the district court properly denied Mehserle immunity on the basis of those facts. As recounted above, before the district court was evidence that: Grant struggled with Mehserle and Pirone because they were preventing him from breathing; Grant was adequately subdued before Mehserle shot him; Pirone was surprised by Mehserle's command that he stand back (because Pirone thought Grant was adequately subdued); and Grant's hands were behind his back when Mehserle shot him. *See Porter*, 546 F.3d at 1135, 1141–42 (remanding to the district court with instructions to consider, among other things, that a second officer who witnessed a fatal officer-involved shooting was "shocked" by the five shots his colleague fired into the decedent's car).

In light of these and other facts, which Mehserle disputes, the district court concluded that "there is a genuine issue of material fact as to whether Mehserle's actions were required by a legitimate law enforcement purpose . . . ." We do not disturb that conclusion, *Johnson*, 515 U.S. at 314, and agree that given the factual dispute before it, which must be resolved by a jury, the district court *could not* have properly granted Mehserle qualified immunity. Accordingly, and correctly, it did not.[5]

---

[5] We note that Oscar Grant, Jr.'s Fourteenth Amendment claim makes reference to "rights, privileges, and immunities secured by the First, Fourth, and Fourteenth Amendments." There is, however, no argument as to what First or Fourth Amendment rights Oscar Grant, Jr. is attempting to assert, either on his own behalf or that of his deceased son—though Mehserle argues that Oscar Grant, Jr. may not assert any Fourth Amendment rights vicariously on his son's behalf. *See Alderman v. United States*, 394 U.S. 165, 174 (1969) ("Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be

## 2. We lack jurisdiction to hear an appeal asserting a right to federal law qualified immunity from a California state law (Civil Code § 52.1) violation.

Mehserle seeks qualified immunity from the California Civil Code § 52.1 claim against him (based on the same conduct underlying the plaintiffs' section 1983 claims), but the doctrine of qualified immunity does not shield defendants from state law claims. *Cousins v. Lockyer*, 568 F.3d 1063, 1072 (9th Cir. 2009); *see* Richard H. Fallon, Jr., et al., *Hart and Wechsler's The Federal Courts and the Federal System* 1006 (6th ed. 2009) ("The immunity of *state* officials in actions based on state law is itself governed by state law, for absent wholly arbitrary action by the state, there is no distinctive federal interest."). Nevertheless, Mehserle urges, because the plaintiffs' section 52.1 claim reaches the same underlying conduct as their section 1983 claims, Mehserle should be equally immune to both.

We rejected an identical argument in *Liberal v. Estrada*, 632 F.3d 1064 (9th Cir. 2011), in which we held that we lacked jurisdiction to entertain a defendant's interlocutory

---

vicariously asserted."). *But see Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 369 (9th Cir. 1998) ("In § 1983 actions, however, the survivors of an individual killed as a result of an officer's excessive use of force may assert a Fourth Amendment claim on that individual's behalf if the relevant state's law authorizes a survival action."); *Smith*, 818 F.2d at 1416–17 (finding, under California law, a Fourth Amendment claim under section 1983 survives the death of the plaintiff). Though Mehserle made the same argument in the district court, the district court failed to address it in its order. On remand, if Oscar Grant, Jr. intends to proceed with any theory other than a deprivation of familial companionship under the Fourteenth Amendment, the district court should determine whether he is entitled to assert such a claim under California's survival statute.

appeal that he was entitled to qualified immunity from a section 52.1 claim. *Id.* at 1076. We cannot deviate from *Liberal*'s holding. *Miller v. Gammie*, 335 F.3d 889, 899–900 (9th Cir. 2003) (en banc). Nor are we inclined to: Mehserle could have appealed the district court's decision to deny him immunity under California state law, rather than under the federal law doctrine of qualified immunity; he did not. *Liberal*, 632 F.3d at 1074–76. Absent appellate jurisdiction, we do not reach the district court's ruling denying Mehserle immunity from the plaintiffs' section 52.1 claim.

**3. Mehserle is entitled to qualified immunity from a claim that he unlawfully arrested Anicete.**

Mehserle protests that the district court neglected to address Anicete's claims against him entirely, even though Mehserle sought immunity from those claims. We agree with Mehserle that the district court did not give adequate consideration to Anicete's claims against him, though we do so mindful of the enormity of the task the district court faced.

The parties presented the district court with a host of claims against a group of officers and municipal entities, and then made cross-motions for summary judgment that they supported in a disorderly, muddled, and confusing manner. The district court attempted to impose some level of coherence on the case by discussing those claims that made sense for a given plaintiff to bring against a particular officer. But by structuring its decision in that fashion, the district court analyzed claims that appeared nowhere in the pleadings, and omitted claims that *did* appear in the pleadings. For instance, the district court asked whether Mehserle used excessive force against the Brysons (one of whom Mehserle handcuffed), Reyes (with whom Mehserle had no contact),

and Greer (likewise), but the plaintiffs' excessive force claim was made only on behalf of Greer and Anicete, and against Pirone (who threw Greer on the ground) and Knudtson (who tackled and handcuffed Anicete) only. There was no need for the district court to conduct an excessive force analysis as to Mehserle, though we understand why it did: the plaintiffs, in opposing summary judgment, argued that the officers' use of Tasers in detaining *all* the plaintiffs constituted excessive force—a claim the plaintiffs never before raised.

Anicete did, however, plead unconstitutional seizure and unconstitutional arrest claims against Mehserle, and Mehserle moved for summary judgment on those claims. Nonetheless, the district court did not discuss Anicete at all when addressing the initial seizures of Reyes, the Brysons, and Greer (unsurprisingly, since Anicete was not yet detained), and when discussing unconstitutional arrest, the district court only addressed Mehserle's treatment of the two people he handcuffed—Grant and Jack Bryson.

What to do with Anicete's claims against Mehserle? There is only one point at which the district court's order can be read to reach those claims: when the district court denied *all* the officers (including Mehserle) qualified immunity for the detention of *all* of the plaintiffs (including Anicete), beginning at the point at which Pirone ordered Mehserle to arrest "him and him" (the second and third of the district court's time periods). Anicete, however, was not detained or arrested until after Pirone gave his order; Knudtson tackled and handcuffed Anicete just as Mehserle shot Grant. The plaintiffs would have us stop with this observation and conclude that the district court intended, implicitly, to leave Mehserle—and every other officer sued—responsible for Anicete's arrest and detention.

But we must grant Mehserle qualified immunity from suit over an act in which he played no part.  *See Hopkins v. Bonvicino*, 573 F.3d 752, 769–70 (9th Cir. 2009) (granting an officer qualified immunity for his partner's unlawful entry of a house, which occurred while the officer interviewed a witness on the front lawn).  There is no evidence in the record that Mehserle played any part in Anicete's arrest; consequently, we hold that he is entitled to qualified immunity from a claim that he unlawfully arrested Anicete.

The district court's order also denies Mehserle qualified immunity from claims arising from Anicete's extended detention at BART police headquarters, and from the extended detentions of Reyes and Nigel Bryson.  Mehserle contends he is entitled to immunity from those claims, as well; we turn now to that argument.

4.  **The district court failed to consider whether there was any evidence that Mehserle participated in the extended detentions of Anicete, Reyes, or Nigel Bryson.**

On the orders of BART police Commanders White and Gibson (neither of whom is a defendant in this case), Reyes, both of the Brysons, Greer, and Anicete were taken to BART police headquarters and detained, in handcuffs, for hours. Mehserle argues he had nothing to do with the prolonged detentions of Anicete, Reyes, or Nigel Bryson, and is therefore entitled to qualified immunity from their claims arising out of those detentions.  The district court held that it did not matter whether Anicete, Reyes, and Nigel Bryson had any evidence implicating Mehserle in their prolonged detentions, and instead, that the burden fell to Mehserle to exculpate himself from their claims.

In reaching that conclusion, the district court appears to have misread our opinion in *Dubner v. City and County of San Francisco*, 266 F.3d 959 (9th Cir. 2001). In that case, Dubner, a photographer, sued after being arrested without probable cause during a demonstration outside San Francisco's Moscone Center. Ziegler, the officer listed as having arrested Dubner, had no recollection of arresting her at all. *Id.* at 964. No other officer recalled even having seen Dubner at the demonstration. *Id.* at 965. Ultimately, the success of Dubner's claim for unlawful arrest depended on her being able to show that she was arrested without probable cause; however, once Dubner demonstrated that the police lacked a warrant to arrest her, the burden shifted to the police to produce some evidence they had probable cause for the arrest. *Id.* We held that because Dubner had made every effort to ascertain the identity of the officers responsible for her arrest, and because the burden fell to the police to demonstrate they had probable cause to arrest Dubner, then the burden also fell to the police to come up with the identity of the officer who actually made the arrest—without it, there would be no way to demonstrate that the officer had the necessary probable cause. *Id.* at 965–66.

In the case before us, the district court quoted from *Dubner*—"'[i]f the defendant is unable or refuses to come forward with any evidence that the arresting officers had probable cause and the plaintiff's own testimony does not establish it, the court should presume the arrest was unlawful'"—and then concluded that Mehserle was required to demonstrate he had nothing to do with the prolonged detentions of Anicete, Reyes, and Nigel Bryson in order to escape liability for them. *Dubner*, however, establishes only that we will find the police lack probable cause to make an arrest—and therefore that the arrest is unlawful—if the police

are unable to identify who made the arrest, or why. But the issue we must evaluate here is not whether Mehserle had probable cause to arrest Anicete, Reyes, or Nigel Bryson; it is whether Mehserle was at all responsible for their prolonged detentions. The district court did not rely on the record in trying to resolve the question, and instead relied erroneously on *Dubner* to conclude that the absence of evidence implicating Mehsrele was, as a matter of law, "of no account." Because the district court's legal error prevented it from making the factual findings necessary to decide whether Mehserle is entitled to immunity from claims arising out of Anicete's, Reyes's, and Nigel Bryson's prolonged detentions, we remand this issue to the district court with instructions to review the record and determine whether there are disputed issues of fact as to Mehserle's involvement with Anicete's, Reyes's, and Nigel Bryson's detentions.

**5.  The district court properly denied Mehserle qualified immunity from Jack Bryson's unlawful arrest claim.**

Mehserle arrested Jack Bryson on Pirone's order to arrest "him and him," and argued before the district court that he made a reasonable mistake when he arrested the wrong "him," Jack Bryson. (Pirone testified that he meant for Mehserle to arrest Grant and Greer.) The district court denied Mehserle qualified immunity for the arrest, concluding that whether Mehserle's mistake was reasonable is a question for the jury. We agree. *See, e.g.*, *Wilkins v. City of Oakland*, 350 F.3d 949, 955–56 (9th Cir. 2003) (holding that the question of whether officers made a reasonable mistake when they shot their own undercover colleague must be submitted to a jury).

Mehserle argues that he is otherwise entitled to qualified immunity from Jack Bryson's unlawful arrest claim, because he had probable cause to arrest Bryson independently of Pirone's order. *See Rosenbaum v. Washoe Cnty.*, 663 F.3d 1071, 1076 (9th Cir. 2011) (noting that an officer is immune to a claim of unlawful arrest if he had probable cause for the arrest, *i.e.*, it was not actually unlawful, or if "it is *reasonably arguable* that there was probable cause for arrest"). Specifically, Mehserle posits, he had probable cause to arrest Jack Bryson for violating California Penal Code § 148, which penalizes interference with a law enforcement officer in the performance of his duties, because Mehserle "personally observed Bryson creat[ing] a disturbance, incit[ing] the crowd, and disregard[ing] Mehserle's instructions during a tense, escalating event on the platform to which Mehserle had been called for backup."

Bryson's alleged creation of a disturbance consisted of his cursing the officers, but "[e]ven though the police may dislike being the object of abusive language," section 148 does not allow them "to use the awesome power which they possess to punish individuals for conduct that is not only lawful, but which is protected by the First Amendment." *In re Muhammed C.*, 95 Cal. App. 4th 1325, 1330–31 (2002); *see also Duran v. City of Douglas*, 904 F.2d 1372, 1377 (9th Cir. 1990) (opining that "making obscene gestures" and "yelling profanities in Spanish," while "boorish, crass and, initially at least, unjustified," is "not illegal"); *cf. Swartz v. Insogna*, 704 F.3d 105, 109–11 (2d Cir. 2013) (observing, among other things, that police officers cannot arrest someone for the "disorderly conduct" of giving the officers the finger). If Bryson was exhorting people to commit violence against the officers, it would be arguable that Mehserle had probable cause to arrest him. *See generally Brandenberg v. Ohio*,

395 U.S. 444, 447 (1969) (per curiam) (observing that states may criminalize speech that is "directed to inciting or producing imminent lawless action and is likely to incite or produce such action").  But what Bryson may have said to the crowd is *at least* a disputed question of fact—the record reflects only what Bryson said *to the officers*—and thus, like the question whether Mehserle reasonably misunderstood Pirone's command, must be left to a jury.  We therefore affirm the district court's ruling denying Mehserle qualified immunity from Jack Bryson's unlawful arrest claim.

## B.

## Anthony Pirone

### 1.  Pirone was properly denied qualified immunity for his initial detention of Reyes, the Brysons, and Greer.

Pirone stopped Reyes, the Brysons, and Greer to investigate a misdemeanor violation of California Penal Code § 242 (*i.e.*, a misdemeanor battery); such an investigatory stop requires a police officer to have "reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.'"  *United States v. Basher*, 629 F.3d 1161, 1165 (9th Cir. 2011) (internal citations omitted).  Pirone argued, and argues, that he had reasonable suspicion to stop the men based on a report that a group of black males, wearing similar clothing, were fighting in the train car outside of which he spotted the group—and that the group attempted to evade Pirone as he approached.  The district court held these facts were insufficient to arouse suspicion in support of Pirone's investigatory stop, and therefore denied him qualified immunity from Reyes's, the Brysons', and Greer's unlawful detention claims.  We agree with the district court's

conclusion that Pirone is not entitled to qualified immunity from those claims, but arrive at that conclusion by a different route.

Determining whether an officer had reasonable suspicion to conduct an investigatory stop can be a tricky proposition, particularly when one of the factors motivating the stop was, as in this case, the race of the suspects. Race is of little value in distinguishing one suspect from others, particularly where everyone in the pool of possible suspects is of the same race. *See United States v. Montero-Camargo*, 208 F.3d 1122, 1135 (9th Cir. 2000) (en banc) (observing that where most people who transverse a checkpoint are Hispanic, the fact that a particular person transversing it is Hispanic is of little value in establishing reasonable suspicion); *Morgan v. Woessner*, 997 F.2d 1244, 1254 (9th Cir. 1993) (holding that a tip to look out for a black person, without more, does not give rise to reasonable suspicion to stop anyone). But race is a trait that, when *combined with others*, can reasonably lead an officer to zero in on a particular suspect. *Montero-Camargo*, 208 F.3d at 1134 nn.21 & 22. A reviewing court must therefore consider all the factors on which an officer relied in combination, rather than separately, in determining whether the officer had reasonable suspicion to stop a particular suspect. *United States v. Arvizu*, 534 U.S. 266, 273 (2002); *United States v. Sokolow*, 490 U.S. 1, 8 (1989); *United States v. Cortez*, 449 U.S. 411, 417 (1981); *see, e.g.*, *Terry v. Ohio*, 392 U.S. 1, 22 (1968) (noting that the investigating officer "observed Terry . . . go through a series of acts, each of them perhaps innocent in itself, but which taken together warranted further investigation"); *Paine v. City of Lompoc*, 160 F.3d 562, 566 (9th Cir. 1998) (finding that the police had reasonable suspicion to stop a suspected pugilist after receiving a report of a fight, witnessing a ring of apparent

spectators, and after an onlooker yelled, "Cops!," observing the suspect leave with a second, bloodied person).

Here, many of the factors Pirone listed as his basis for suspecting the group of being the fighters he was looking for are, by themselves, innocuous. Other than their race, Pirone cited the group's attempt to elude him on the train platform, *but see Florida v. Royer*, 460 U.S. 491, 497–98 (1983) (holding that one does not arouse reasonable suspicion merely by attempting to walk away from the police), and the fact that its members were standing and talking near the train car from which the fight was reported. Whether combining these factors creates sufficient suspicion to stop the group is a difficult question, but it is one we need not resolve, because Pirone's stop was constitutionally unsound in another respect: when Pirone arrived on the platform, it is undisputed that no crime was afoot. Pirone was instead, as he conceded at argument, investigating a completed misdemeanor, and we held—prior to the events at issue here—that the Fourth Amendment constrains officers who conduct stops to investigate completed misdemeanors. *United States v. Grigg*, 498 F.3d 1070, 1079–81 (9th Cir. 2007).

In determining whether the Fourth Amendment permits an officer to detain a suspected misdemeanant, *Grigg* requires us to "consider the nature of the misdemeanor offense in question, with particular attention to the potential for ongoing or repeated danger (*e.g.*, drunken and/or reckless driving), and any risk of escalation (*e.g.*, disorderly conduct, assault, domestic violence)." *Id.* at 1081; *see also United States v. Hensley*, 469 U.S. 221, 228 (1985) ("[T]he exigent circumstances which require a police officer to step in before a crime is committed or completed are not necessarily as pressing long afterwards. Public safety may be less

threatened by a suspect in a past crime who now appears to be going about his lawful business . . . ."). Here, Pirone came upon a group of black men who were doing nothing but talking when he arrived. There is an insufficient basis to conclude, from anything Pirone witnessed, that there was a likelihood for "ongoing or repeated danger," or "escalation." Pirone nevertheless pulled a weapon (his Taser) on the young men, admittedly for the purpose of "intimidation," and using profanity, ordered them to be seated.

Would our hypothetical reasonable officer, given the law we articulated in *Grigg* and his task of avoiding constitutional violations, have behaved as Pirone did? We think not. Whether or not Pirone articulated facts sufficient to support his suspicion of Reyes, the Brysons, and Greer, we conclude that given the questionable nature of Pirone's authority to detain the group for a misdemeanor that abated before his arrival, the district court properly denied Pirone qualified immunity—at this stage of the proceedings and on the record before it—from their claim of unlawful detention.

## 2. Pirone is not entitled to qualified immunity for conducting a de facto arrest of Reyes and the Brysons.

The district court found that Pirone, in pulling his Taser on Reyes and the Brysons to facilitate their detention, may have effectively placed them under arrest without the requisite probable cause. The district court denied Pirone qualified immunity from Reyes's and the Brysons' claims that he unlawfully arrested them, allowing a jury to determine whether Pirone behaved reasonably in using a Taser to facilitate an investigatory stop. Pirone argues that the district court erred, and that he is entitled to qualified immunity from the Brysons' and Reyes's unlawful arrest claims, because

brandishing his Taser did not transform an investigatory stop into a de facto arrest, or if it did, that Pirone made a reasonable mistake in doing it.

Courts "examine the 'totality of the circumstances' in deciding 'whether an investigative detention has ripened into an arrest,'" focusing "on the perspective of the person seized, rather than the subjective beliefs of the law enforcement officers." *United States v. Charley*, 396 F.3d 1074, 1080 (9th Cir. 2005) (quoting *Eberle v. City of Anaheim*, 901 F.2d 814, 819 (9th Cir. 1990)). "The question is thus whether a reasonable innocent person in [the same] circumstances would not have felt free to leave after brief questioning." *Id.* (internal quotation marks omitted). While this standard suggests that "[u]nder ordinary circumstances, drawing weapons and using handcuffs are not part of a *Terry* stop," *United States v. Miles*, 247 F.3d 1009, 1012 (9th Cir. 2001), we have recognized some circumstances in which it is appropriate for an officer to use a level of force that would ordinarily bring to mind arrest, *i.e.*: (1) "where the suspect is uncooperative or takes action at the scene that raises a reasonable possibility of danger or flight;" (2) "where the police have information that the suspect is currently armed;" (3) "where the stop closely follows a violent crime;" and (4) "where the police have information that a crime that may involve violence is about to occur." *Washington v. Lambert*, 98 F.3d 1181, 1189 (9th Cir. 1996); *see United States v. Buffington*, 815 F.2d 1292, 1300 (9th Cir. 1987) ("The use of force during a stop does not convert the stop into an arrest if it occurs under circumstances justifying fears for personal safety.").

The district court applied this standard and determined that Pirone threatened Reyes and the Brysons with his Taser

even though "there appeared to be no objective indication of violent activity or of any criminal activity for that matter," and Pirone's limited knowledge of the fight aboard the train included that no weapons were used. The court therefore found that a jury "could conclude that a reasonable person would not believe that he was at liberty to leave." Pirone contends that "from the perspective of a reasonable officer on the scene," brandishing a Taser was appropriate: Pirone was outnumbered, responding to a violent crime, had no way of knowing whether the men were armed (he knew only that no weapons were *used* in the fight), and was surrounded by intoxicated BART patrons. Moreover, Pirone argues, the stop lasted only a few minutes, and when he attempted to make the stop, Grant and Greer fled on to the train. And at no time did Pirone strike or handcuff Reyes or the Brysons.

We note that the specific quantum of force involved in *using* a Taser was not clearly established at the time that Pirone merely *threatened* its use, *see Bryan v. MacPherson*, 630 F.3d 805, 824–26 (9th Cir. 2010), a fact that suggests the application of qualified immunity—if the claim at issue turned on the amount of force Pirone applied to stop Reyes and the Brysons. But that is not the claim at issue.[6] Regardless of the injury a weapon is capable of inflicting, we begin from the presumption that no weapons are used at all in conducting an investigatory stop. *Miles*, 247 F.3d at 1012. After all, a reasonable person is unlikely to feel free to leave after answering a few questions, *Charley*, 396 F.3d at 1080, if the prelude to the officer's query involves the display of a weapon for the explicit purpose of intimidating that reasonable person. Although the level of force resulting from

---

[6] The district court granted Pirone qualified immunity from an excessive force claim related to his display of the Taser.

a Taser's application had yet to be established at the time of these events, it was already established that using a Taser constitutes *some* level of force, *Bryan*, 630 F.3d at 833, and it was certainly beyond cavil that a Taser is a weapon. *See United States v. Wallace*, 800 F.2d 1509, 1512–13 (9th Cir. 1986) (affirming the district court's finding that, as a matter of law, "an electronic taser or stun gun" is a "dangerous weapon" for the purpose of committing the crime of boarding a plane with a concealed dangerous weapon). Of course, we allow that in extraordinary circumstances, an officer may "draw[] weapons," *Miles*, 247 F.3d at 1012, but we agree with the district court's assessment that the evidence does not demonstrate indisputably that Pirone found himself in those circumstances.

Despite Pirone's argument about the conditions on the platform when he arrived, Pirone testified he pulled his Taser on the young men for the purpose of "intimidation," and not because he feared for his safety or the safety of anyone else on the platform.[7] A desire to cow suspects into compliance is not one of the previously enumerated reasons for which we countenance the use of weapons during an investigatory stop. Moreover, Pirone testified that he drew his Taser before he

---

[7] Moreover, while we recognize video recordings may offer an imperfect account of an event for a number of reasons, *e.g.*, because of acts occurring outside the camera's field of vision, we note that video from the platform security camera does not appear to support Pirone's contention that the Fruitvale platform was crowded with intoxicated passengers when he arrived. *See Terry*, 392 U.S. at 20 (framing the relevant inquiry as "whether the officer's action was justified *at its inception*, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place" (emphasis added)). Instead, it appears that no other passengers stepped off the train until after Pirone threw Greer to the floor, long after he pulled his Taser.

"made contact" with the group, belying an argument that he did so to prevent Reyes or the Brysons, or anyone else, from taking flight—a flight which would have been futile, since the train on to which they might have fled could not leave the Fruitvale Station until BART released it. And not knowing whether a suspect is armed is not the same as having reason to believe the suspect is actually armed.

We are therefore left with the question whether it was reasonable, on the facts with which he was presented, for Pirone to use, or threaten to use, *any* weapon *at all* in conducting an investigatory stop—or whether Pirone effectively arrested Reyes and the Brysons.**[8]** That question must be resolved by a jury. Accordingly, we affirm the district court's decision to deny Pirone qualified immunity from Reyes's and the Brysons' claims that by drawing his Taser, Pirone arrested them unlawfully.

---

**[8]** The cases cited by Pirone are not to the contrary; all involve circumstances under which a suspect was uncooperative or likely armed. *See, e.g.*, *Allen v. City of L.A.*, 66 F.3d 1052, 1055–57 (9th Cir. 1995) (finding no unlawful arrest when a suspect was ordered from a car at gunpoint, handcuffed, and held for no more than 24 minutes—when the police just completed a high-speed pursuit of the car); *United States v. Alvarez*, 899 F.2d 833, 836–39 (9th Cir. 1990) (finding no unlawful arrest when a suspect was removed from his car at gunpoint—when the police were tipped off that the suspect was armed with explosives and about to rob a bank); *United States v. Greene*, 783 F.2d 1364, 1366–68 (9th Cir. 1986) (finding no unlawful arrest when two suspects were taken from their car at gunpoint—when the police were told the men, suspected of bank robbery, had a pistol).

### 3. Pirone is not entitled to qualified immunity from Greer's unlawful arrest claim.

Lastly, Pirone argues the district court incorrectly denied him qualified immunity for arresting Greer, whom he pulled from the idling train, threw to the ground, and handcuffed. Pirone contends he had probable cause to arrest Greer for impeding him in the performance of his duties—a violation of California Penal Code § 148—because by returning to the train, Greer evaded Pirone's attempt to detain and question the entire group of young men. The district court found that because Pirone lacked both "probable cause to believe that plaintiffs had committed any underlying criminal violation," and "reasonable suspicion to detain plaintiffs for investigatory purposes," Pirone also lacked probable cause to arrest Greer for violating section 148.

A suspect cannot be arrested for violating section 148 because he evaded an officer's attempt to arrest him unlawfully. *See, e.g.*, *Blankenhorn v. City of Orange*, 485 F.3d 463, 472 (9th Cir. 2007) ("Although Blankenhorn was also arrested . . . under California Penal Code section 148(a), any such resistance (and corresponding probable cause) arose out of the initial arrest for trespassing. If there was no probable cause to arrest Blankenhorn for trespassing in the first place, it makes no difference for the present purposes if he resisted arrest."); *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 920 (9th Cir. 2001) ("Officers Stone and Barnes arrived after the alleged battery occurred. The officers could therefore not lawfully arrest Arpin for the battery. If the officers could not lawfully arrest Arpin for the battery, the officers could also not lawfully arrest Arpin for resisting arrest."). Here, the district court found that Pirone had no lawful basis for stopping Reyes, the Brysons, Greer,

and Grant, and therefore had no lawful basis to pursue and arrest Greer for not acceding to the investigatory stop. A reasonable officer, it continued, would have known as much after *Blankenhorn*. Because we agree with the district court that Pirone had no lawful basis to detain the group initially, we also agree with the district court that he is not entitled to qualified immunity for arresting Greer over Greer's refusal to accede to the unlawful detention.

## C.

### Marysol Domenici

Domenici raises only one issue on appeal: she contends that she is entitled to qualified immunity for Reyes's, Greer's, Anicete's, and the Brysons' prolonged detentions at BART headquarters, because like Mehserle, there is no evidence of her involvement in those detentions. Unlike Mehserle, however, the district court *did* make a factual finding regarding Domenici's involvement in the extended detentions of the Brysons and Reyes, pointing to her appearance in eyewitness video of the incident, after Mehserle shot Grant, and therefore observing that the "[e]vidence suggests that nonetheless Domenici continued to participate in [the] detentions up until the time that Mehserle shot Grant *and thereafter*" (emphasis added). The district court reached no conclusions about Domenici's immunity from claims arising out of Greer's and Anicete's extended detentions, relying improperly on *Dubner* (as it did with Mehserle). To the extent the district court relied solely on *Dubner* to deny Domenici immunity from any of the plaintiffs' claims, we remand to the district court to determine whether the facts support granting Domenici immunity from those claims.

To the extent the district court relied upon disputed facts
to deny Domenici immunity, we lack jurisdiction to review
that denial. *Johnson*, 515 U.S. at 319–20. In *Johnson*, the
seminal case on this point, the Supreme Court affirmed the
Seventh Circuit's decision not to review a district court's
denial of qualified immunity to three out of five police
officers who allegedly beat the plaintiff, Jones. The officers
argued for qualified immunity, because "whatever evidence
Jones might have about the *other* two officers, he could point
to no evidence that *these three* had beaten him or had been
present while others did so." *Id.* at 307. In response, Jones
pointed to his deposition testimony, in which he claimed that
unknown officers used excessive force when arresting him
and later at the police station. *Id.* He then pointed to portions
of the depositions of the three protesting officers, in which all
three admitted they were present both at Jones's arrest and at
the police station afterwards. *Id.* at 307–08. The district
court denied the officers summary judgment on the question
of their immunity, finding that Jones had presented sufficient
evidence of the three officers' involvement to proceed to trial.
*Id.* at 308. The Seventh Circuit affirmed, and the Supreme
Court affirmed the Seventh Circuit, holding that "a defendant,
entitled to invoke a qualified immunity defense, may not
appeal a district court's summary judgment order insofar as
that order determines whether or not the pretrial record sets
forth a 'genuine' issue of fact for trial." *Id.* at 319–20; *see
also Wilkins*, 350 F.3d at 952 ("On an interlocutory appeal of
a denial of qualified immunity, this court . . . may [not] . . .
conduct an inquiry into the sufficiency of evidence to support
a finding" that police officers did, in fact, violate a plaintiff's
constitutional right).

Domenici nevertheless urges us to review the issue here,
because the district court never gave her the opportunity at

summary judgment to address her presence in the eyewitness video. Federal Rule of Civil Procedure 56(e) or (f), Domenici argues, requires the district court to permit her to respond to what she characterizes as the district court's sua sponte denial of her motion for summary judgment. But the ability to appeal *any* denial of summary judgment is the narrow exception, not the rule. *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 106–07 (2009). Even if the district court made a mistake in denying Domenici qualified immunity solely on the basis of her presence on the platform at the conclusion of a witness's video, it is a mistake that can be sorted out later: either Domenici will prevail at trial, or she may appeal following a trial in which she is found liable for the plaintiffs' extended detentions. If the record then is similarly devoid of evidence of her involvement, the matter will be resolved easily in her favor. *See Johnson*, 515 U.S. at 316–17 (noting that the courts of appeals can resolve, after trial, the factual issues that are off-limits during interlocutory appeals of denials of qualified immunity). We recognize that the entire point of the doctrine of qualified immunity is to spare officers the burden of unnecessary litigation, but we will not lightly expand the basis on which *any* officer may appeal a denial of qualified immunity just because of the possibility the district court erred in *this* case. *See id.* at 315 ("We of course decide appealability for categories of orders rather than individual orders.").

## IV.

We conclude by returning to basic principles. "The resolution of immunity questions," like those presented by these appeals, "inherently requires a balance between the evils inevitable in any available alternative." *Harlow v. Fitzgerald*, 457 U.S. 800, 813 (1982). On one hand, culpable

officials should not receive blanket immunity from liability; on the other, officials who make reasonable mistakes while trying to do their jobs should not bear the costs of litigation—nor should the taxpayers underwriting the officials' defense. *Id.* at 814. Our society vests law enforcement officers with the authority to carry and use weapons and tactics that may injure, sometimes fatally, people they suspect of committing crimes. Officers are given a degree of responsibility concomitant with that grave authority, with the expectation that they will exercise it discerningly. Because of that expectation, the doctrine of qualified immunity dictates that courts will not substitute their judgment for the officers' own in evaluating the officers' reactions to novel and dangerous situations. But none of that means we abandon our expectation that the police will discharge their duties professionally and responsibly.

Bearing that expectation in mind, we are presented with the plaintiffs' account of facts in which one officer, Pirone, responded to a call regarding a misdemeanor scrape on a train—which concluded before he arrived—by pulling a weapon on a group of men who were standing around talking. Pirone sought to intimidate the group, which he assumed may have been responsible for the fight. Pirone then sought out two of the men who walked away from him by pacing the platform and screaming profanities in his search for them. The men were all handcuffed and held overnight—but never charged with a crime—after another officer, Mehserle, shot and killed one among them. It is possible that a jury will conclude, after weighing all the facts, that the officers committed no constitutional wrongs. But our task at this stage in the litigation is not to attempt to weigh the facts and resolve the issues definitively in favor of one party or

another. It is instead to construe the facts in the manner most favorable to the plaintiffs, who have a right to their day in court, and then ask if our solicitude of the judgment of law enforcement in this case requires us to shield the officers from further participation in this lawsuit. (Even though "an action for damages may offer the only realistic avenue for vindication of constitutional guarantees." *Id.* at 814.) Construing the facts in the plaintiffs' favor, we agree largely with the district court that the officers should stand trial for the constitutional violations of which they are accused. Accordingly, we hold:

- Mehserle is not entitled to qualified immunity from Oscar Grant, Jr.'s Fourteenth Amendment claim, and AFFIRM the district court's judgment;

- We lack jurisdiction to review the district court's judgment denying Mehserle qualified immunity from the plaintiffs' California Civil Code § 52.1 claim, and DISMISS that portion of Mehserle's appeal;

- Mehserle is entitled to qualified immunity from Fernando Anicete, Jr.'s unlawful arrest claim, and REVERSE the district court's judgment;

- Because the district court relied improperly on *Dubner* in denying Mehserle qualified immunity as to their extended detention claims, its judgment is VACATED, and on remand, the district court shall determine whether there is any evidence that Mehserle is responsible for the extended detentions of Fernando Anicete, Jr., Carlos Reyes, or Nigel Bryson;

- Mehserle is not entitled to qualified immunity from Jack Bryson, Jr.'s unlawful arrest claim, and AFFIRM the district court's judgment;

- Pirone is not entitled to qualified immunity from Reyes's, the Brysons', and Greer's claim for unlawful detention, and AFFIRM the district court's judgment;

- Pirone is not entitled to qualified immunity from Reyes's and the Brysons' claim for unlawful arrest, and AFFIRM the district court's judgment;

- Pirone is not entitled to qualified immunity from Michael Greer's unlawful arrest claim, and AFFIRM the district court's judgment; and

- To the extent the district court relied on *Dubner* to deny Domenici immunity, its judgment is VACATED, and it shall reconsider its decision on remand in accordance with this opinion; beyond that, we lack jurisdiction to review Domenici's appeal.

- Each party shall bear its own costs on appeal.

**AFFIRMED IN PART, REVERSED IN PART, VACATED IN PART, DISMISSED IN PART, AND REMANDED.**